THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ANDREW P. SCHOTT, JR., *et al.*, Defendants-Appellants.

Second District (1st Division)    No. 75-8

Opinion filed June 7, 1976.—Rehearing denied July 16, 1976.

Julius L. Echeles, of Chicago, for appellants.

Patrick E. Ward, State's Attorney, of Dixon (Edward N. Morris and Phyllis J. Perko, both of Illinois State's Attorneys Association, of counsel), for the People.

Mr. PRESIDING JUSTICE GUILD delivered the opinion of the court:

The three defendants herein were each indicted for six counts of armed robbery against six different parties and a seventh count of aggravated battery committed on one Randy C. Hacker. Count IV of the indictments charging armed robbery of one H. D. Pratt was *nolle prossed* by the State as it appears in the record that Pratt had entered the armed services. The defendants were tried by a jury and found guilty of the five counts of armed robbery and the one count of aggravated battery. The trial court held that the aggravated battery was a "lesser offense" and set the conviction aside as to that offense. The court thereupon sentenced each of the three defendants to 6-18 years in the State Penitentiary as to each count of armed robbery with the sentences to run concurrently.

The evidence for the State was that on the night of January 3, 1974, Lana Beane and Randy C. Hacker were at the residence of one Doug Dawson on a farm in Nelson, Lee County, Illinois. About 9:30 in the evening a man came to the door, subsequently identified as the defendant John L. Lee, and stated that his car was in a ditch and asked to use the telephone. He was allowed to use the telephone and he then reentered the room where he produced a gun and told Randy C. Hacker and Lana Beane to lie down on the floor. Lee then opened the door and the two other defendants, subsequently identified as Andrew P. Schott, Jr. and James E. Sutton, entered the residence. They were disguised with nylon stockings placed over their heads. It further appears that Lee then placed a stocking over his head as well. All three men were armed. About 10 p.m. Derek Hunter and his wife Phyllis knocked at the door of the farmhouse and they were admitted. The three masked men then tied up and blindfolded Hunter with masking tape. Mrs. Hunter and Lana Beane were subsequently tied up and blindfolded. $220 was taken from Hunter. About 10:30 in the evening Tom Petitti, Dan Quigley, H. D. Pratt and Remigio "Ray" Jimenez arrived at the Dawson farmhouse in Quigley's car. Petitti went to the door and the other three remained in the car. A man with a nylon stocking over his head and with a gun in his hand took Petitti into the room where the other victims were sitting with their eyes taped and their hands tied. Money was taken from Petitti. Shortly thereafter Quigley, Pratt and Jimenez were ordered out of the car at gunpoint by a man with a mask and taken into the farmhouse. $22 was taken from Quigley and $160 was taken from Jimenez. All four were tied up and blindfolded with masking tape. About 11:30 in the evening Dave Jacobs, who resided at the Doug Dawson farm, arrived home. He was met at the door by Lee, taken into the room with the other victims, tied up and blindfolded. About $1000 was taken from the person of Dave Jacobs. At the trial Remigio Jimenez identified the defendant Lee; Tom Petitti

identified the defendant Schott; Lana Beane identified both defendant Sutton and defendant Lee; and Mrs. Hunter identified all three defendants.

About 1:30 in the morning of January 4, 1974, the three defendants left the farmhouse, leaving the above enumerated people tied up and/or blindfolded in the farmhouse. The victims were able to free themselves from their bonds and called the police shortly after 1:30 a.m. An alert was sent out over the police radio describing the vehicle of the defendants as being a yellow 1969 Thunderbird and one of the occupants being described as wearing plaid pants and an Army-type jacket. The car also was described as having Iowa license plates. About 45 minutes later defendants were arrested by a State Trooper in Bureau County after having received the ISPRA message in reference to the armed robbery which occurred in Nelson, Illinois. The State Trooper stopped the vehicle of the three defendants, which was a yellow, 1969 Thunderbird with a white top. The defendants were handcuffed and taken to the Bureau County jail. The vehicle was removed to the police station and searched. In the trunk of the defendants' car the police officers found three handguns, four shotguns, a .22-caliber rifle in a case, and David Jacobs' firearms identification card. Marijuana was also found in the trunk of the car. The shotguns and rifle were subsequently identified by David Jacobs as being his property which was taken from the Dawson farmhouse during the robbery.

Prior to the trial the defendants filed a motion to suppress the evidence seized, including all the physical evidence found in the trunk of the defendants' car. The motion to suppress was denied.

At the trial the three defendants testified that defendant Schott didn't know how the guns could have gotten into his trunk and the other two defendants, likewise, disclaimed any knowledge of the firearms being in the trunk of the vehicle. The three defendants, in substance, testified that they knew Doug Dawson, the owner of the farmhouse where the robberies occurred; that they had gone there to see him and that they sat around and talked to all of the people above enumerated; and that they drank beer and smoked marijuana with the parties there. They all further testified that, inasmuch as Dawson did not return, they left at approximately 1 a.m., at the request of Dave Jacobs who stated to them that one of the parties thought one of them was a narcotics agent. At the time of the report of the robberies the victims stated that approximately $1503 had been taken from Petitti, Hunter, Quigley, Jimenez and Jacobs. $1384 was found in defendant Schott's coat. Schott testified that he had about $1350 in his coat and that he was going to use it to purchae drugs from Doug Dawson as soon as he returned from Chicago. However, at

the time of his arrest Schott advised the State Trooper that the large sum was his and that he was in the real estate and construction business and, therefore, carried large sums of money.

The arresting officers testified that they had received the ISPRA message that the robbery had occurred, that the robbers had left in a late model yellow Thunderbird with Iowa license plates. The officer making the initial arrest testified that he observed the defendants' vehicle at 2:17 a.m. near Buda, Illinois; that it was a late model 1969 Thunderbird, yellow with a white top; and further testified that the information in the ISPRA message was that one of the robbers was wearing plaid pants and a blue Army-type jacket. When the officer stopped defendants' vehicle the defendant Schott came back to the officer's car and the officer observed that he was wearing plaid pants with a blue Navy-type jacket. The three men were arrested and the Thunderbird was towed to the heated Bureau County Jail garage, it being -10° F. There was a key found between the hood and the fender of defendants' car which opened its trunk and the guns enumerated above, ammunition, firearms identification card and marijuana were found in the trunk. The three handguns were loaded and apparently the shotguns and rifle were not.

Defendant has raised ten issues in this appeal and we shall consider them in numerical order. It is to be noted at the outset that contentions number 5, 6, 7, 8 and 9 were not raised at the trial.

■■ The first contention of the defendants is that the arresting officer did not have probable cause to arrest the defendants and that the admission into evidence of the articles seized from the trunk violated their constitutional rights. We do not agree. It is undisputed that a robbery had occurred and the message had gone out via ISPRA that three or more men had left the scene in a late model yellow Thunderbird shortly after 1:30 a.m. The arresting officer observed, at 2:17 a.m., a late model yellow 1969 Thunderbird with a white top going down the highway about 35 miles from the farmhouse. This is an obviously distinctive type motor vehicle and when defendant Schott exited the vehicle at the request of the arresting officer he was observed to be wearing the type of clothing which one of the robbers had worn at the time of the robbery, to-wit: plaid pants and a blue Navy-type jacket. The alleged discrepancy in the description, to-wit: that it was an "Army-type jacket" and that the car did not have Iowa plates but did have a white top, does not alter the fact that this unusual type vehicle was observed and the driver thereof was wearing clothing which substantially fit the description given out over the police radio. Furthermore, the arresting officer determined that the motor vehicle and the occupants had been in the area of the robbery at the time in question. We, therefore, find that the arresting officer had probable cause to arrest the driver of the vehicle and the occupants thereof. Having

probable cause to arrest the same, the removal of the motor vehicle to the heated Bureau County Jail garage and the subsequent search thereof was proper. In *People v. Hanna* (1969), 42 Ill. 2d 323, 247 N.E.2d 610, we find a similar case to the one before us. Counsel for the defendant in that case, who is the same counsel who is involved in the case before us, raised this same issue, contending that probable cause did not exist for the warrantless arrest of the defendant therein and the ensuing search of the trunk of the car in the police station. The court in *Hanna* stated:

> "The rules that a warrantless arrest may be made on the basis of probable cause and that a warrantless search may be made incidental to a valid arrest have been too often stated by us to require extended reiteration here. [Citations.] Whether probable cause existed must be governed by the totality of the facts and circumstances in each case." (42 Ill. 2d 323, 328-29, 247 N.E.2d 610, 613.)

In *Hanna* the defendants were arrested as a result of a radio message, the license plates did not match and the court held that there was ample justification for the officer stopping the car and questioning its occupants. The court went on to hold that the search of the motor vehicle at the police station likewise was proper. In *People v. Canaday* (1971), 49 Ill. 2d 416, 275 N.E.2d 356, we again find a case where the defendant was arrested in an automobile which matched the description of the car used in a burglary after the policeman received a radio report of the burglary. While it is true certain television sets were observed in the back seat of that automobile, the motor vehicle was taken to the Morgan County sheriff's office and the trunk of the car was searched and stolen items found therein. A motion to suppress this evidence was made and denied and the Supreme Court of Illinois, in citing *Chambers v. Maroney* (1970), 399 U.S. 42, 26 L. Ed. 2d 419, 90 S. Ct. 1975, stated:

> "The Supreme Court rejected the contention that the search without a warrant at the police station was improper. It was observed that the auto which could have been properly searched on the highway could as well be searched without a warrant at the police station, because the probable cause to search it continued. The movement of the vehicle to the station did not create any duty to secure a search warrant." (*People v. Canaday* (1971), 49 Ill. 2d 416, 421, 275 N.E.2d 356, 359.)

In *Chambers* there was a police radio message that there had been a robbery by two men, one of them wearing a green sweater and the other a trench coat and driving a station wagon. When the station wagon was stopped in response to the police radio message, one of the men was wearing a green sweater and there was a trench coat in the car. Strikingly similar to *Chambers*, one of the robbers subsequently identified as the

defendant Schott, was described in the police message as wearing plaid pants, indicated above, and the "Army" or Navy-type blue jacket. We therefore find that the possible discrepancies in the description of the motor vehicle and the license plates are insignificant in consideration of the other facts relating to the description of the vehicle and the occupants as indicated above.

■■ When the defendant Schott was stopped by the police officer on the highway, the officer asked him where he had been and he replied that he had been in the Rock Falls-Sterling area. The second question of the officer dealt with the $1300 found in Schott's coat in the car. Defendants' second contention is that these statements were improperly admitted against the defendants as Schott had not yet been given his *Miranda* warnings. Examination of the record indicates that, in fact, Schott had been given his *Miranda* warnings prior to the question as to where the money in his coat came from. The first statement as to where he had been was a routine question and this issue has been decided by the Supreme Court as follows:

> "Thus, statements made in response to routine investigatory questions, asked during a brief initial period of noncoercive detention and designed to clarify a suspicious circumstance, have often been held admissible under *Miranda*. [Citations.]" (*People v. Thompson* (1971), 48 Ill. 2d 41, 44, 268 N.E.2d 369, 371.)

See also *People v. Hubbard* (1973), 55 Ill. 2d 142, 152, 302 N.E.2d 609, 614. We find no error in this regard.

It is also to be noted that all three defendants took the stand and each not only testified they were in the Rock Falls-Sterling area but admitted that they were in the Dawson farm where the robbery took place on the night and time in question.

Defendants' next object to the trial court's granting of the State's motion *in limine* made prior to the opening of the defendants' case to prevent the defendants from calling one Mr. Lira as a witness. Ray Jimenez, a State's witness, had earlier testified that he went to the Dawson farm to purchase a gun from Jacobs. The defendants made an offer of proof that Lira would testify that Jimenez had told Lira that he was going to the Dawson farm to purchase LSD. Defendants contend that, in granting the motion *in limine*, the trial court thereby denied defendants an opportunity to impeach a State's witness; prevented the defendants from substantiating their theory that they had gone to the farm to purchase marijuana by using Lira's testimony to show that drugs were available at the farm; and finally, prevented defendants from showing that Jimenez threatened Lira when he saw him in the court building, as alleged by defense counsel.

■■ Regarding the impeachment of Jimenez, we first note, contrary to the position of the State, that the proffered testimony of Lira, if used to

impeach Jimenez by prior inconsistent statement, would not be hearsay since it would not be offered for the truth of the facts contained therein. (See *People v. Morgan* (1963), 28 Ill. 2d 55, 190 N.E.2d 755.) However, Lira's testimony would still be inadmissible as impeachment because no proper foundation was laid for such testimony (see *People v. Sanders* (1974), 56 Ill. 2d 241, 306 N.E.2d 865), and additionally, it would be irrelevant and collateral to the issues of the case (see *People v. Cappalla* (1926), 324 Ill. 11, 154 N.E.451). Furthermore, defendants cannot complain that the exclusion of Lira's testimony denied them an opportunity to present testimony that drugs were available on the farm. If Lira's testimony were to be used for such a purpose, it would constitute inadmissible hearsay. While evidence of prior inconsistent statements of a witness is admissible to affect his credibility, such evidence does not afford substantive proof of the facts stated therein. (See *People v. Morgan.*) Thus, even if Lira's testimony were admitted, the trial court would have had a duty to instruct the jury as to the limited purpose for which such evidence was offered.

■■ Defendants also argue that the trial court erred in refusing to allow Lira to testify to alleged threats made to him by Jimenez or to conduct a *voir dire* examination into this matter. First, we find that by failing to make an offer of proof on this alleged incident defendants have failed to properly preserve the issue for review. Notwithstanding this waiver, we find that testimony concerning the alleged hostility of Jimenez to Lira would be irrelevant to the issues of the case and, if used for purposes of impeaching Jimenez, collateral. In this regard, the statement of the court in *People v. Whitehead* (1966), 68 Ill. App. 2d 48, 495, 216 N.E.2d 237, 241, *rev'd on other grounds*, 35 Ill. 2d 501, 221 N.E.2d 256, is instructive:

> "We have been shown no cases where the dislike of witnesses for one another was considered proper for exploration during a trial. We think that the feelings of Mrs. Whitfield [a State's witness] toward Mr. Washington [a defense witness] are too tangential to be admissible as evidence at this trial."

We, therefore, find no error in the trial court's granting of the motion *in limine* with regard to the testimony of the proffered witness, Lira.

■■ The fourth contention of the defendants is that a witness violated the court's order excluding witnesses. In the cross-examination of Dave Jacobs he said that he talked to some of the witnesses as they were sitting in the office waiting to be called to testify. Apparently all of the witnesses were in one room. In response to an inquiry by defense counsel as to whether he had talked to Lana Beane and Randy Hacker, who had previously testified, Jacobs stated that they told him what they had said in court. In response to the inquiry as to what they told him, he replied,

"They told what happened * * * said it wasn't as difficult as they thought it would be." Defense counsel then asked, "Did they tell you specifically what questions were asked?" and Jacobs replied, "Not that I remember. I don't believe they did." Defense counsel contends this is in violation of the order entered by the trial court at the commencement of the trial, which simply reads, "All witnesses must remain outside the courtroom until called to testify." At best this might possibly be considered an indirect violation of an order excluding witnesses. In *People v. Decker* (1974), 19 Ill. App. 3d 86, 93, 311 N.E.2d 228, 234, a witness, who was not present at the time of the exclusion order, was advised by the State's Attorney as to the substance of a previous witness' testimony. That witness then took the stand and testified. As pointed out in *Decker*, the most the defendant had done was to assert an indirect violation of the exclusion order and had failed to show how the trial court had abused its discretion in permitting the testimony to stand. In the case before us, the court merely excluded the witnesses from the courtroom. It has been repeatedly held that even where the witness is in the courtroom in violation of the court's order, it is within the discretion of the trial court as to whether that witness may be permitted to testify. For a discussion of violations of an exclusion order where a witness remains in the courtroom attention is directed to 14 A. L. R. 3d 16 (1967), "Effect of Witness Violation of Order of Exclusion." The great weight of authority appears to be that it is within the discretion of the trial court to admit the testimony of a witness who remains in the courtroom in violation of the court's exclusion order. However, in the case before us that is not the factual situation. The mere fact that the witness did state that he had talked to witnesses who had previously testified does not, in itself, in view of the nature of the limited exclusion order herein referred to, warrant the finding that the court abused its discretion in not granting a mistrial as requested by the defense counsel. It is to be noted that defense counsel did not inquire further than as indicated above as to what discussion was had by the witness Jacobs with the prior witnesses. We find no error in the court's denial of the motion for a mistrial on the basis of the above. *People v. Decker* (1974), 19 Ill. App. 3d 86, 93, 311 N.E.2d 228, 234.

■■ The fifth contention of the defendant is that some, if not all, of the prosecution witnesses engaged in the use of controlled substances during the time of the alleged robbery. Examination of the record does not disclose this to be true. In the first place, it is to be noted that the only two witnesses who could have used marijuana were Randy Hacker and Lana Beane, the other witnesses were tied up and blindfolded upon entering the house. The testimony of Randy Hacker was that there was marijuana in a drawer in the premises. He denied that he had been smoking it prior to the entry of the three defendants in the premises. Lana Beane testified

that during the entire evening she smoked cigarettes. It is true, as defendants point out, that Hacker said he did smell cannabis burning and in answer to the inquiry on this point stated, "during the period the three subjects were there, yes." He was then asked if he smoked any and he replied, "No." Defendants contend that this evidence tended to demonstrate that the prosecution witnesses engaged in the use of cannabis on the night in question and that the court should have held a hearing to determine the effect, if any, of such use. The only two witnesses, as pointed out above, that could have possibly have used marijuana denied the same and the other six witnesses obviously did not have the opportunity to use marijuana had they so desired. We find this contention without merit and note that the same was not raised during the trial.

■■ The sixth contention of the defendants is that the trial court improperly inquired of the jurors whether any of them had read newspaper articles or heard a radio broadcast relating to one of the defendants. During the trial the defendant Schott was arrested for an unrelated offense. In response to the defendants' request the court interrogated the jurors as to whether or not any of them had read or heard of this arrest in the following manner:

> "Ladies and gentlemen of the jury, we are sorry for this delay, but it is something that can't be helped. I am going to make an inquiry of you, if your answer is in the affirmative, raise your hand, if not, don't do anything. My question is: Have any of you heard or read anything about this trial or anything about any of the defendants outside of the proceedings conducted yesterday throughout the trial that caused you to form an opinion one way or the other? None of you.
> Proceed with the trial."

Defendants contend that the proper procedure would have been for the court to inquire whether the jurors had been exposed to the publicity and, if so, could they still be fair and impartial jurors. We find that the interrogation of the jurors as to whether they had read or been prejudiced by any radio or newspaper publicity was sufficient. We further note that this issue was not raised in the trial court nor did trial counsel object to the form of the inquiry by the court. As pointed out in *People v. Curry* (1973), 56 Ill. 2d 162, 170, 306 N.E.2d 292, 296:

> "It is settled that specific objections to the admission of evidence waive all grounds not specified (*People v. Canaday*, 49 Ill. 2d 416, 423-24) and that one may not raise on appeal a question which was not properly presented to the trial court. (*People v. Amerman*, 50 Ill. 2d 196, 197; *People v. O'Malley*, 404 Ill. 165, 170-171.)"

As in *Curry*, it is also to be noted that this issue was not raised in the post trial motion and the court in *Curry* held that "[u]nder these circumstances

we conclude the defendant has waived consideration of this issue on appeal." 56 Ill. 2d 162, 170, 306 N.E.2d 292, 296.

■■ Defendants' seventh contention is that physical evidence and testimony relative thereto was improperly admitted against them. The first contention in this regard is that the chain of custody of such evidence was not sufficiently established. This issue was not raised in the trial court and the Supreme Court has squarely passed upon this in *People v. Polk* (1960), 19 Ill. 2d 310, 167 N.E.2d 185. As stated in *People v. Pruitt* (1974), 16 Ill. App. 3d 930, 941, 307 N.E.2d 142, 152, in citing *People v. Pruitt*:

> "An objection to the failure to establish the chain of possession must be made at trial or it is waived on appeal."

We therefore find that this issue was waived. The second part of this contention deals with the admission of certain evidence which was not connected to the defendants. Numerous items were taken during the course of this armed robbery and were introduced as State's Exhibits 1 and 3 through 35. Many of the items consisted of the contents of three billfolds. One of the billfolds was found by a Mrs. Collins several weeks after the robbery. On February 21, 1974, a deputy sheriff went to the scene where the first billfold was found and recovered two more billfolds and many items which apparently had been in the billfolds, such as identification cards, social security cards, credit cards and the like. He also found a roll of masking tape. These items were found by the deputy alongside the road leading from the farmhouse or in a field nearby. Many of the items were identified by the victims as having been taken from them at the time of the robbery. It may be true that the ownership of one or more of the items introduced was not shown. This was the basis of the defense counsel's objection to the admission of the items at the trial. As indicated above, several of the victims testified as to the taking of money from their persons by the defendants, totalling over $1300. This sum, $1384, was found in the coat of the defendant Schott. We find, in light of all of the evidence and the testimony at trial, that if the ownership of any of the miscellaneous contents of the billfolds found strewn upon the field or the three billfolds themselves were not sufficiently identified, that the admission of the same into evidence is harmless error.

■■ The eighth contention of the defendants is that no scientific evidence was adduced that the masking tape found on defendant Lee's shoes or found by the roadway matched the tape used to blindfold the persons in the farmhouse. Likewise, defendants contend that the fact that Deputy Koppein testified, without objection, that there was blood on a pair of gloves identified as one of the defendants' required scientific proof that it was human blood and that it matched the blood of one of the victims. It is true that no scientific testimony was adduced as to either the tape or the blood; however, the fact remains that there was masking tape

used to blindfold the victims and that masking tape was found on the shoe of defendant Lee when arrested. The fact also remains that the police officer stated that there was blood on one of the pair of gloves. The State concedes that the State's Attorney may have indicated in his closing arguments that the stains on the gloves were blood and that the evidence did not definitely support such a conclusion. On the other hand, we find that defense counsel in closing argument commented rather exhaustively on the blood on the gloves question, to-wit:

> "Based on the sole testimony of Mr. Hacker, no one else testified seeing any blood, save the blood on the gloves * * *. What about the blood on the gloves? We know they were sent to the crime lab, don't we, because that is where they came back from for blood analysis, weren't they? Did we hear anything about blood types, comparisons and identical *blood found* on those gloves as compared with the blood of Randy Hacker? Not one word." (Emphasis added.)

It is obvious that defense counsel conceded that the stains were, in fact, bloodstains, and chided the State for failure to connect up the blood type with that of the victim. We find, as the State points out, that Deputy Koppein's testimony as to his observation that the stains on the gloves were blood and the odd coincidence of finding masking tape on the shoe of defendant Lee, when masking tape was used to blindfold the victims, goes to the weight of the evidence rather than to its admissibility. Lastly, we expressly point out that this eighth contention was not raised in a post-trial motion.

The ninth contention of the defendants deals with the statements of the State's Attorney in closing argument relative to the blood on defendant Sutton's gloves and the masking tape on defendant Lee's right shoe. The State's Attorney argues that this evidence was not necessary as they had nine people who were hostages, seven of whom testified. He further commented that the defendant could have subpoenaed the other two witnesses, to-wit: the victim Pratt and the owner of the farmhouse, Doug Dawson. Considering the case as a whole, we do not feel that the State's Attorney's comment was improper. The fact remains that seven witnesses did, in fact, testify substantially to the effect that they were robbed at gunpoint, blindfolded and tied up by the three defendants who were positively identified. Under these circumstances we feel that the record as a whole is overwhelming as to the guilt of the defendants and that any error resulting from the State's Attorney's comments is harmless.

The last argument of the defendants is that trial counsel was incompetent in failing to raise the issues set forth above as defendants' contentions 5, 7, 8 and 9. While defendants were represented by privately retained counsel, defense counsel has pointed out that in *People v. Long*

(1973), 12 Ill. App. 3d 974, 979, 298 N.E.2d 784, 787, the appellate court there stated: "* * * a fair trial is not diluted by the fact that he chose his own trial counsel as distinguished from having been the recipient of court-appointed counsel." Defense counsel fails to point out that in *People v. Long* the appellate court further held, "Incompetence of trial counsel warranting reversal must be of such character as to make the trial a farce." Furthermore, in the recent case of *People v. Torres* (1973), 54 Ill. 2d 384, 391, 297 N.E.2d 142, 146, the Supreme Court of Illinois again stated that in the case of privately retained counsel that, "In such a case the court will not reverse a conviction because of the incompetency of counsel unless the representation is of such low caliber as to amount to no representation at all or reduces the court proceedings to a farce or a sham."

Defense counsel has pointed out to us that several Federal Circuit Courts of Appeal have rejected the "farce-mockery" test as the criterion of incompetence of trial counsel and have adopted the test as being that of "rendering reasonably effective assistance." Defendants admit that in the case at bar the trial was not a farce, a sham or a mockery of justice but that trial counsel's representation did not reasonably render effective assistance as required by the more enlightened case law. We do not adopt the Federal rule but do find that trial counsel did, in fact, render reasonably effective assistance. Defense counsel vigorously represented his clients, moved to suppress the evidence, moved for discovery and, after a vigorous defense at the trial, moved for a new trial. Whether trial counsel agrees with appellate counsel as to the issues to be raised on appeal is a matter of legal discretion on the part of counsel. As the trial court pointed out, the evidence against the defendants herein was overwhelming. Under those circumstances we believe the defense counsel presented the best possible defense. We therefore affirm.

Affirm.

SEIDENFELD and HALLETT, JJ., concur.