# Illinois Official Reports

## Appellate Court

---

### *People v. Torres*, 2021 IL App (2d) 200420

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ALEXIS TORRES, Defendant-Appellant. |
| District & No. | Second District<br>No. 2-20-0420 |
| Filed | November 15, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Lake County, No. 18-CM-2227; the Hon. Helen S. Rozenberg-Franks, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Thomas A. Lilien, and Jessica Wynne Arizo, of State Appellate Defender's Office, of Elgin, for appellant.<br><br>Eric F. Rinehart, State's Attorney, of Waukegan (Patrick Delfino, Edward R. Psenicka, Katrina M. Kuhn, and Lawrence M. Bauer, of State's Attorneys Appellate Prosecutor's Office, of counsel, and Lindsey Aranguren, law student), for the People. |

JUSTICE JORGENSEN delivered the judgment of the court, with opinion.
Justices Hutchinson and Hudson concurred in the judgment and opinion.

## OPINION

¶ 1    Following a bench trial, defendant, Alexis Torres, was convicted of solicitation of a sexual act (720 ILCS 5/11-14.1(a) (West 2018)) and sentenced to 12 months of supervision. At issue in this appeal is whether defendant was proved guilty beyond a reasonable doubt. We determine that defendant was proved guilty beyond a reasonable doubt. Accordingly, we affirm.

¶ 2                                    I. BACKGROUND

¶ 3    Evidence presented at defendant's bench trial consisted of testimony from Detective Matthew Harmon and Deputy Ashley Pomazal—both of the Lake County Sheriff's Office—and defendant. In addition, the State submitted as exhibits the advertisement for escort services to which defendant responded and the text messages exchanged between defendant and the law enforcement officers.

¶ 4    Detective Harmon testified that his work focuses on human trafficking and prostitution. In August 2018, he was part of a nationwide operation called "The Day of Johns," which was created to suppress the demand for purchased sex. One Lake County operation was conducted out of Spring Hill Suites, a hotel in Waukegan. While female officers working undercover posed as prostitutes, other officers were in adjacent hotel rooms, monitoring what was happening on closed-circuit television sets. No recordings of these interactions were made. As part of his role with this effort, Detective Harmon created two website advertisements. One was published in Mega Personals, and the other was published in Skip the Games.

¶ 5    The advertisement published in Skip the Games was listed under the "Category" of "Female escort." It stated that "a cute, fun girl [is] looking to make all your dreams come true!!!" Underneath this statement were three pictures of the backside of a woman, who was leaning over in a sexually suggestive position. Below the photographs, the advertisement stated that anyone interested could e-mail or call the "cute, fun girl." The advertisement then provided a physical description of the girl, which included her race and hair color. "Cash" was indicated as the "Accepted payment method[ ]." Below this information was this text: "Hi baby!! I'm a cute, clean, fun, discreet girl looking to make all your fantasies a reality. I have good rates and am doing in-call only at my room!! I'd love to see you ;) call or text me at [phone number]." At the bottom of the advertisement, in smaller type, was a "Legal disclaimer." It stated:

> "I am a professional service provider. Any fees or compensation paid to me are for my time and companionship only. Any actions that take place within our contracted timeframe are a matter of mutual choice between consenting adults. Any scenarios, fantasies or otherwise, contained in this ad are purely that; they do not constitute any form of contractual obligation. I do not engage in any unlawful acts. I reserve the right not to enter into any arrangements with those whom I reasonably believe to be under the influence of drugs or alcohol, or for any other reason at my sole discretion."

¶ 6        Detective Harmon testified that, after the advertisement was posted on Skip the Games, several people responded. One of those people was defendant, who responded via text on August 14, 2018, at 5:19 p.m. Defendant and Detective Harmon, who was posing as the girl referenced in the advertisement, had the following text exchange:

"[DEFENDANT]: Hi there how r u?

[DETECTIVE HARMON]: Good how r u

[DEFENDANT]: Good thanks I'd like to meet Are u available?"

Defendant and Detective Harmon then discussed what time they could meet. Detective Harmon wrote that he was in Waukegan. After defendant indicated that he was in Gurnee and could come to Waukegan right away, the following exchange was had:

"[DETECTIVE HARMON]: How long. Of date you want?

[DEFENDANT]: 30 minutes

[DETECTIVE HARMON]: is 100$ [*sic*] ok

[DEFENDANT]: That's fine baby Can u let me feed ur kitty two times in 30 minutes [*sic*] visit baby? If I finish within my time

[DETECTIVE HARMON]: Yes of course"

Defendant asked Detective Harmon to send him the address where they could meet, and Detective Harmon texted defendant to go to the Walmart in Waukegan. Once there, Detective Harmon would text defendant which hotel to go to. When defendant asked Detective Harmon for his name, Detective Harmon told defendant that he was talking to "Lauren." Defendant asked Detective Harmon to send him a picture. The picture Detective Harmon sent defendant was of Deputy Pomazal. The picture showed Deputy Pomazal's lower chin and chest. She was wearing what appeared to be a push-up bra and tank top. Defendant asked Detective Harmon to send a picture of "Lauren's" face, and Detective Harmon refused, saying that it was "too risky" and that there were "[t]oo many cops out there." After defendant pressed for a picture of "Lauren's" face, defendant asked Detective Harmon if "Lauren" was a "cop." Detective Harmon responded, "No way. Are you?" Defendant replied, "No."

¶ 7        Once defendant arrived at the Walmart, he texted Detective Harmon, "Where do I go now?" Detective Harmon responded, "SpringHill Suites." Defendant proceeded to the hotel, informing Detective Harmon when he arrived that he was "in the parking lot babe." Detective Harmon told defendant to go to room 325, and defendant asked again whether "Lauren" was "a cop or work[ing] for law enforcement in sting operation babe." Detective Harmon replied, "Hell no." Defendant said, "Ok" and "See u in a few."

¶ 8        Deputy Pomazal was in room 325 when defendant arrived at around 6:18 p.m. Detective Harmon was in an adjacent room watching, through closed-circuit television feed, the exchange between defendant and Deputy Pomazal. When Deputy Pomazal opened the door, defendant greeted and hugged her. Deputy Pomazal told defendant where to put the money. Once Detective Harmon heard this, he knew "the exchange occurred then." Officers then entered the room and arrested defendant. Detective Harmon testified that he believed, but was not sure, that there was money on the table where defendant was directed to put it.

¶ 9        Deputy Pomazal elaborated on what transpired in room 325. She testified that, when she opened the door of the room, defendant hugged her and kissed her on the neck. Defendant then turned around and closed and latched the door. Defendant grabbed Deputy Pomazal's breasts; ran both of his hands down the side of her body to her buttocks; felt around Deputy Pomazal's

buttocks toward her vagina; and then ran his hands from her vaginal area to her belly button. As he did this, he asked Deputy Pomazal if she was wearing a wire. After defendant touched her in this way, he asked if she wanted to check him for a wire. She quickly patted him down.

¶ 10    Deputy Pomazal then sat on the bed "and asked [defendant] if he wanted to ejaculate inside of [her] per the conversation that [she] had read with the text messages." Defendant "said he did want to do that twice." Deputy Pomazal asked, "Is a hundred dollars okay?" Defendant replied, " 'Yes.' " After defendant and Deputy Pomazal discussed using a condom, Deputy Pomazal pointed to a table in the room and told defendant he could put the money there. Defendant turned to walk toward that table. At that point, the officers monitoring the situation entered the room.

¶ 11    On cross-examination, Deputy Pomazal stated that she did not wear a recording device because she believed that the officers "need[ed] an overhear to do something like that."

¶ 12    The State rested, and defendant moved for a directed finding. He argued that Deputy Pomazal solicited him to commit a sexual act, not the other way around. The trial court denied the motion, finding that the text messages between defendant and Detective Harmon and the conversation between defendant and Deputy Pomazal indicated that defendant knowingly agreed to exchange money for sex.

¶ 13    Defendant testified that, when he entered room 325, he kissed Deputy Pomazal on the cheek or neck. Defendant asked Deputy Pomazal "if she wanted to play," and she said yes. Defendant asked, " 'How do I know?' " Deputy Pomazal then reached between defendant's legs and squeezed his genitals. After that, defendant "roll[ed]" his hands over Deputy Pomazal's back, buttocks, and between her legs. Deputy Pomazal then told defendant to put the money on a nearby table. Defendant told Deputy Pomazal that that was not the reason for his visit. Defendant explained to her that he "wanted to have a conversation, speak with her based on the ad that was [on] the website." Defendant testified that the advertisement said nothing about paying for any services, and he denied that he offered to pay Deputy Pomazal. When Deputy Pomazal asked defendant to place the money on the table, he again refused. She then asked him whether he wanted to "f*** her" or have her fellate him. Defendant declined such services. Deputy Pomazal then asked defendant if he wanted to ejaculate inside of her, and defendant admitted that he said, " 'Yes.' " He did not offer her any money. He asked if she had any "protection," and she said, " 'Over there,' " pointing to the bathroom. Deputy Pomazal walked over to the bathroom, and defendant began "feeling nervous that [he] would get in trouble." Since Deputy Pomazal was now away from the door, defendant opened it to leave. However, there were officers behind the door, and he was arrested. Defendant testified that he never offered Deputy Pomazal any money, as he believed that any encounter between himself and Deputy Pomazal was consensual.

¶ 14    On cross-examination, defendant testified that he knew Skip the Games provided "[e]scort services" but, at the time, he did not "know what escorts do." Although defendant did not intend to do anything illegal when he arrived at the hotel, he admitted that he asked if he was talking to a police officer. Defendant explained that he did so because he prefers not to "deal" with people who are police officers. Defendant went to meet "Lauren" because he wanted to talk and he thought that eventually they could have sex if they both consented. Defendant admitted that the advertisement provided for " 'cash' " payment and that he typed everything in the text message exchange, including that he wanted to feed "Lauren's" kitty twice during

their 30-minute date. Despite wanting to feed "Lauren's" kitty, defendant admitted that he did not bring any cat food with him to the hotel.

¶ 15 The trial court found defendant guilty, reasoning as follows:

"[T]he evidence is overwhelming that the defendant intended to pay money in exchange for a sex act. I find [Deputy Pomazal's] testimony *** to be credible. The text messages show that there is an intent to pay money once [defendant] got there and that he in effect made an agreement as to what he would be paying for and that that [*sic*] was finalized when he was within the room. It is an agreement to pay money for a sex act. I don't know that there is anything that requires that money actually be shown.

It gives the Court pause that this website contains a legal disclaimer indicating that nothing illegal would be done. But the statute regarding solicitation does not require that one knowingly violates the law. It only requires an agreement for money in exchange for sex. And I think that's been proved in this case."

¶ 16 This timely appeal followed.

¶ 17                                II. ANALYSIS

¶ 18 At issue in this appeal is whether defendant was proved guilty beyond a reasonable doubt. The question is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "The weight to be given the witnesses' testimony, the credibility of the witnesses, resolution of inconsistencies and conflicts in the evidence, and reasonable inferences to be drawn from the testimony are the responsibility of the trier of fact." *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006). Accordingly, we will not substitute our judgment for that of the trial court on issues concerning the weight of the evidence or the credibility of the witnesses. *People v. Brown*, 2013 IL 114196, ¶ 48. We will set aside a defendant's conviction only if the evidence against him is so improbable or unsatisfactory that it creates a reasonable doubt of his guilt. *People v. Collins*, 106 Ill. 2d 237, 261 (1985).

¶ 19 Defendant argues that the State failed to prove him guilty beyond a reasonable doubt of solicitation of a sexual act (720 ILCS 5/11-14.1(a) (West 2018)). Solicitation of a sexual act is committed when:

"Any person *** offers a person not his or her spouse any money, property, token, object, or article or anything of value for that person or any other person not his or her spouse to perform any act of sexual penetration *** or any touching or fondling of the sex organs of one person by another person for the purpose of sexual arousal or gratification ***." *Id.*

¶ 20 Defendant claims that the State failed to prove him guilty beyond a reasonable doubt because he never "actually 'offered' money in exchange for a sex act and the website advertisement that solicited his business stated that he would be paying for 'companionship only.' " Moreover, defendant argues that he cannot be found guilty beyond a reasonable doubt, because he "only accepted the offer that the undercover officer made on the website." Finally, defendant takes issue with the trial court's conclusion that " 'he in effect made an agreement as to what he would be paying for and that was finalized when he was within the room.' "

Defendant contends that, to the contrary, "the testimony did *not* show that anything was 'finalized' within the room."

¶ 21    Viewing the evidence in the light most favorable to the State, we determine that defendant was proved guilty beyond a reasonable doubt. Specifically, defendant found an advertisement through an online escort service. Through the contact information on the advertisement, he began exchanging text messages with "Lauren." He agreed to pay "Lauren" $100 to "feed [her] kitty two times." Although defendant did not text that he wanted "sex," it could be inferred that defendant used the word "kitty" to refer to "Lauren's" vagina, which defendant would "feed" with his penis. See *People v. Bradford*, 62 Ill. 2d 21, 23 (1975) (the defendant was proved guilty beyond a reasonable doubt of agreeing to perform " 'oral copulation,' " even though the complainant used a vulgarity for that act in testifying at trial, because "[t]here [was] no indication in the record that the trial judge was unaware of the meaning of the vulgarity"); *People v. Curry*, 56 Ill. 2d 162, 166, 174 (1973) (the defendant was proved guilty beyond a reasonable doubt of various offenses related to prostitution where the officer called the defendant's phone number and told her "he was 'out for a little fun' "); *People v. Garmon*, 394 Ill. App. 3d 977, 984 (2009) ("Although the word 'stolen' was not used during the entirety of th[e] transaction [between the defendant and the police officer], these veiled references to stealing could be inferred by the trier of fact as an explicit representation, in the same manner that slang references to stealing have been similarly determined by other jurisdictions."). Then, rather than telling defendant that he could meet "Lauren" at the hotel, Detective Harmon instructed defendant to go to a nearby Walmart first, where he would be given further instructions. Defendant did so. Once defendant was at the Walmart, Detective Harmon told defendant what hotel to go to. When defendant arrived at the hotel's parking lot, Detective Harmon told defendant to go to room 325. During the text exchanges, defendant asked twice whether "Lauren" was a police officer. Based on the secretive nature of the texts (including their coded sexual content) and defendant's suspicion that he was dealing with a police officer, the reasonable inference is that defendant wanted to commit an illegal act—to have sex with "Lauren" for money. See *People v. Jones*, 2014 IL App (3d) 121016, ¶ 26 ("A trier of fact is, indeed, entitled to draw a commonsense inference that a defendant's suspicious behavior resulted from his knowledge that he was committing a crime."). Once defendant was in room 325, he closed and locked the door and either sexually molested or extensively patted Deputy Pomazal down. Deputy Pomazal then asked, consistent with what defendant requested in the text messages, if defendant wanted to ejaculate inside of her. Defendant replied, consistently with his text, that he wanted to do so twice. He and Deputy Pomazal agreed upon the price of $100, and he proceeded toward the table where she instructed him to place the money. Notably, though defendant testified that he arranged to meet "Lauren" because he wanted to have a conversation with her, he also testified that, upon arrival, the first thing he asked Deputy Pomazal was whether she wanted to "play," not converse. Defendant also admitted that he told Deputy Pomazal at the hotel that he wanted to ejaculate inside of her. We agree with the trial court that the "evidence [was] overwhelming that the defendant intended to pay money in exchange for a sex act."[1]

---

[1]This court has found that an advertisement (" 'young warm and ready :)—18' ") and text messages, which contained the defendant's request for " '[k]isses and [a] bj,' " were enough alone to find the

¶ 22        Relying on *People v. Braddock*, 348 Ill. App. 3d 115 (2004), defendant argues that he was not proved guilty beyond a reasonable doubt. In *Braddock*, the evidence presented at the bench trial revealed that the defendant (a police officer) approached an undercover police officer posing as a prostitute and asked her if she was looking for "a date." *Id.* at 118. The undercover officer replied that she was and then asked the defendant "what he was looking for." *Id.* The defendant said that he was looking for "sex." *Id.* The undercover officer testified that she understood " 'sex' " to mean " 'an act of sexual penetration.' " *Id.* The defendant then asked the undercover officer how much she charged, the undercover officer replied that she charged $30 to $40, and the defendant agreed to that price. *Id.* The parties agreed to meet at another location, and while the defendant was driving there, he stopped the undercover officer again. *Id.* A conversation ensued about payment, and the defendant told the undercover officer that "he was 'just looking to get his nut off.' " *Id.* The undercover officer testified that this meant that the defendant wanted to engage in " 'an act that would cause him to ejaculate.' " *Id.* After the defendant showed the undercover officer money, he was arrested. *Id.*

¶ 23        In concluding that the defendant was proved guilty beyond a reasonable doubt, the appellate court credited the undercover officer's testimony. *Id.* at 123. The court determined that, because intent was not an element of solicitation of a sexual act, speech alone is sufficient to prove a defendant guilty beyond a reasonable doubt. *Id.* at 124. Given that the undercover officer defined what both " 'get his nut off' " and " 'sex' " meant, the court observed that "[t]he offense *** was complete when the salient words, an offer to purchase a sexual act for money, were spoken." *Id.* at 123-24.

¶ 24        Defendant argues that, unlike in *Braddock*, he never approached a person on the street and offered money in exchange for sex. "Rather, he went on a website and responded to an advertisement that offered services." Also, the offer he accepted was for services of a benign nature. We do not find these points persuasive.

¶ 25        First, the officers did not make an "offer" when they posted the advertisement. As the State notes, an advertisement is not an offer. *Steinberg v. Chicago Medical School*, 69 Ill. 2d 320, 329-30 (1977). Rather, it is an invitation to "deal" based on the terms of the advertisement. *Id.* Here, the advertisement did just that—it presented an invitation for anyone, including defendant, to deal on the terms that were presented. Defendant's text, asking "Lauren" how she was and if she was available, represented his offer to deal based on the terms of the advertisement. The specific terms were then developed through the texts. Viewed in the light most favorable to the State, those terms contemplated sexual activities. In both *Braddock* and this case, *the defendants*, not the undercover officers, ultimately initiated the parties' specific encounter, though the invitation unfolded differently in the two cases.

¶ 26        Second, the evidence undercuts defendant's argument that, unlike the defendant in *Braddock*, he was seeking merely companionship. Defendant relies on portions of the legal disclaimer—which was in smaller type than the rest of the advertisement—that provided, among other things, that " 'any fees or compensation' were for 'companionship only' " and " 'any actions that take place *** are a matter of mutual choice between consenting adults.' " However, other parts of the advertisement indicated that sexual acts were for sale. Specifically, the advertisement was placed under the "Female escort" section of the website; contained

_____

defendant guilty of various offenses involving sexual acts with a minor. See *People v. Gaciarz*, 2017 IL App (2d) 161102, ¶¶ 3-4, 44.

several sexually suggestive pictures of a woman; stated that the advertiser was "a cute, fun girl looking to make all your dreams come true"; and indicated that payment was to be made in cash. Defendant did, we note, testify that he had no idea what an escort was when he answered the advertisement and that he had planned simply to converse with "Lauren." However, the court, as fact finder, was not required to accept defendant's testimony over Deputy Pomazal's and the other evidence. See *People v. Thompson*, 85 Ill. App. 3d 964, 966 (1980) ("The positive testimony of a single credible witness is sufficient to convict a defendant of prostitution despite the fact that the testimony is contradicted by the accused.").

¶ 27 In addition, defendant argues that, unlike the defendant in *Braddock*, he never uttered the "salient words." *Braddock*, 348 Ill. App. 3d at 124. That is, defendant neither said that he was looking for "sex" nor asked "how much [the undercover officer] charged." *Id.* at 118, 123. However, nothing in the solicitation-of-a-sexual-act statute mandates that the defendant make the initial offer to purchase a sexual act for money. Rather, it provides only that the defendant offers (at some point) a person (who is not his spouse) something of value in exchange for a sex act. 720 ILCS 5/11-14.1(a) (West 2018).

¶ 28 In other contexts, solicitation occurs when the defendant commands, encourages, urges, requests, or advises another to commit an illegal act. *People v. Boyce*, 2015 IL 117108, ¶ 19 (solicitation of murder); *People v. Ruppenthal*, 331 Ill. App. 3d 916, 919 (2002) (indecent solicitation of a child). The offense of solicitation is completed in other contexts when the principal offense is commanded, encouraged, or requested with the intent that it be committed. *Ruppenthal*, 331 Ill. App. 3d at 920. That happened here. As indicated above, a reasonable inference from the text messages is that defendant wanted to have sex with "Lauren" and was willing to pay for that service. The encounter between defendant and Deputy Pomazal in room 325 further supported and finalized, as indicated above, that defendant would pay for sex. The fact that the evidence did not establish that defendant showed Deputy Pomazal money or that the officers never recovered any money from defendant or room 325 is immaterial. See *Braddock*, 348 Ill. App. 3d at 124. Solicitation of a sexual act can be committed simply when a defendant offers something of value in exchange for a sexual act—whether that offer is an initial verbal offer (as in *Braddock*) or an agreement to an offer made in text messages (as in this case). See *id.*; 720 ILCS 5/11-14.1(a) (West 2018); see also *Quality Transportation Services, Inc. v. Mark Thompson Trucking, Inc.*, 2021 IL App (3d) 190489, ¶ 18 ("[S]imply because [the second party] did not initiate the very first conversation with [the first party] does not support an automatic conclusion that [the second party's] subsequent communications with [the first party] can never rise to the level of solicitation." (Internal quotation marks omitted.)).

¶ 29 In reaching our conclusion, we comment briefly on the fact that no recording was made of the exchange between defendant and Deputy Pomazal in room 325. Under the circumstances of this case—where no evidence was presented that a recording was made and then was destroyed, missing, or otherwise not available—the lack of a recording goes solely, if at all, to the weight of the evidence of what transpired between defendant and Deputy Pomazal. See *People v. Schott*, 39 Ill. App. 3d 266, 277 (1976); *People v. Blackburn*, 133 Ill. App. 2d 404, 406 (1971).

¶ 30　　　　　　　　　　　　　　　　III. CONCLUSION

¶ 31　　　　　　For the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 32　　　　　　Affirmed.