THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
BOB MILLER, Defendant-Appellant.

First District (5th Division)   No. 1—89—2180

Opinion filed September 30, 1993.

Rita A. Fry, Public Defender, of Chicago (Cheryl Lipton and Karen Tietz, Assistant Public Defenders, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Veronica Calderon, and Christopher Daddino, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE GORDON delivered the opinion of the court:

Defendant, Bob Miller, was convicted of residential burglary and theft after a bench trial in the circuit court of Cook County. He was tried with two codefendants who were convicted of the same charges. Defendant was sentenced to serve 15 years in the Illinois Department of Corrections.

Defendant raises the following issues on appeal: (1) whether the trial judge erroneously denied defendant's motion to suppress identification testimony; (2) whether the trial judge erroneously admitted evidence of other crimes; (3) whether the trial court should have conducted a hearing to determine whether witnesses had violated its witness exclusion order; (4) whether the State proved defendant guilty beyond a reasonable doubt; and (5) whether the trial court abused its discretion in sentencing defendant to the maximum sentence of 15 years.

Defendant's conviction stems from an incident on February 25, 1985. In the early afternoon complainant, Lillian Prerost, age 69, was visited at her apartment in Cicero by her sister, Elsie Metlicka, age 63. According to the testimony of Ms. Prerost and Ms. Metlicka, the

following events occurred on that day. When Ms. Prerost opened her back door to admit Ms. Metlicka, a man, later identified as codefendant Walter Miller, followed Ms. Metlicka into the kitchen. Ms. Metlicka testified that they were followed by a second man, later identified as codefendant Eli Miller. Walter explained that they were there to repair broken boards on the porch. He asked Ms. Prerost for hot water to pour over the porch boards so the boards could be loosened more easily. Ms. Prerost filled a pail of water and placed it on the kitchen stove.

Walter then brought the two ladies into the living room in the front of the apartment to point out his truck which he said was parked in front of the building. Eli remained in the kitchen. Ms. Metlicka returned to the kitchen, where she found Eli standing near her purse which she had placed on the kitchen table. As Eli moved away, Ms. Metlicka noticed that the purse zipper, which had previously been closed was now open; but nothing was missing from the purse. Eli and Ms. Metlicka remained in the kitchen, while Walter and Ms. Prerost moved back and forth between the kitchen and the living room, Walter pointing out various repairs which were needed.

Ms. Metlicka saw defendant enter the apartment last. He asked Ms. Prerost for a drink of water. Ms. Prerost filled a glass from the bathroom tap and handed it to defendant. Upon returning to the kitchen, Ms. Prerost refilled the pail of water and placed it on the stove at Walter's request, the first pail of water having been poured on the porch boards. Defendant came out of the bedroom, and the three men quickly left. No repair work was done.

After the men left, Ms. Prerost noticed an insurance policy on her bed. The policy had been in a strongbox in her bedroom. $322 was missing from an envelope in the strongbox.

That afternoon, Ms. Prerost and Ms. Metlicka told the Cicero police that the three men were short, dark, and swarthy looking. Three days later, both women positively identified Eli Miller, Walter Miller, and defendant in a six-person lineup.

At trial, on July 22, 1986, Ms. Prerost testified that her eyesight was good at the time of the theft, but she had since had eye surgery which somewhat blurred her vision. Over defendant's objection, Ms. Prerost was allowed to walk around the courtroom, at which time she positively identified Eli Miller, Walter Miller and defendant. Upon returning to the witness stand, Ms. Prerost was shown a photograph of the February 25, 1985, lineup. She testified that during the lineup she had identified numbers 2, 4, and 6 as the three offenders, No. 6 being defendant. Ms. Prerost could not remember whether Ms. Metlicka had

been in the viewing room with her at the lineup. She remembered signing what she thought was a statement at the police station. She also thought that her sister had signed a statement. Officers Baldwin and Tamos of the Cicero police department testified that Ms. Prerost signed only the complaints.

Ms. Metlicka also testified at trial. On direct examination she was shown the lineup photograph. She indicated that No. 6 was the man who had emerged from the bedroom. She then identified defendant in the courtroom.

On cross-examination, Ms. Metlicka stated that on the day of the lineup she and her sister each went into the viewing room alone with a police officer. Neither sister was present when the other sister made the identifications. Ms. Metlicka stated that No. 1 and No. 3 in the lineup picture were taller than the three suspects she identified. She admitted that when she viewed the lineup her attention was drawn to the shorter men, but said this was because she remembered the offenders as being short and dark. Ms. Metlicka also stated that the State's Attorney showed her the lineup photograph the day before testifying and in the morning of the day she testified. She stated that her in-court identification of the offenders was partially based on seeing the lineup photograph. However, she also relied on her memory of the incident, stating, "How can you forget three men that robbed a sister you are so concerned about? How can you forget?"

Ms. Metlicka testified that she told police all three offenders were shorter than average and that one was heavier than the other two. Her testimony was conflicting as to whether the police told her to identify three persons in the lineup.

On redirect, Ms. Metlicka confirmed that she remembered defendant from the incident in her̄ sister's home, although seeing the lineup photograph was helpful. Ms. Metlicka also stated that she had not signed a statement at the police station.

The State then introduced testimony of several witnesses to other crimes. Ms. Libby Hruby, age 81, and her sister Beatrice Bell, age 83, testified regarding an incident on October 22, 1984. These sisters lived in separate apartments next to each other in a building in Cicero. Three men posing as gas company employees entered their apartments without permission claiming there was a gas explosion. One man had Ms. Hruby tap on her stove, then accompanied her to the basement for more tapping. Ms. Hruby identified codefendant Eli Miller in court as that man. Ms. Bell was told by another man to repeatedly tap under the burners of her stove for several minutes, the man handing her knives with which to tap. This man, whom she iden-

tified in court as the defendant, then went with her to the basement to tap on the gas meter. Ms. Bell decided to return to her apartment to call the gas company. As she climbed the stairs she confronted a third man whom she identified in court as being Walter Miller. After the men left, $2,300 was missing from Ms. Bell's apartment.

Ms. Bell testified that she had been shown a photo array of six pictures in her home from which she identified defendant and Walter. She had been shown the photo array by the State's Attorney since that time.

Next, Betty Armalis testified to the theft of cash from her Cicero apartment in the early afternoon of February 19, 1985, by three men who entered her apartment claiming to be water department employees looking for a water pipe leak. On direct examination she identified defendant as one of the three men. However, on cross-examination she changed her testimony and identified codefendant Walter Miller instead. She also stated that she had asked the woman named Lillian (Prerost) after Lillian's testimony if the men were in the courtroom and received an affirmative answer. (That testimony relates to the fact that at the commencement of the trial, the court granted a motion to exclude witnesses. After each witness testified, the court also admonished the witness not to discuss the case with any prospective witness.) On redirect, Ms. Armalis held steadfast to her identification of Walter rather than defendant. Defendant then moved to strike the identification and to question all the witnesses as to whether they had discussed the case among themselves. The trial judge did not allow the other witnesses to be questioned at that time, but he did strike the entire testimony of Ms. Armalis.

On July 25, 1986, the trial continued with Eli as the only codefendant present, defendant and Walter having skipped bail. The trial judge had informed them two days earlier that they could be tried and sentenced *in absentia*.

Sophie Bogdanowicz testified regarding a theft at her Cicero apartment on February 12, 1985. Three men came into her apartment in the early afternoon asking for water for some work they were supposedly doing outside. One man went in her bedroom while the others distracted her. She then saw the man in her bedroom from the bedroom doorway, but she could not enter the bedroom because one of the other men spilled water in the doorway and knelt to wipe it up. Eight hundred dollars was missing when they left. After the incident, Ms. Bogdanowicz had described the three men as dark, Mexican looking, and having similar features, the man in the bedroom being medium height with black hair. At trial she was presented with six pho-

tographs. Ms. Bogdanowicz identified defendant as the man who was in her bedroom. The photographs were the same photographs shown to her earlier by police and by the State's Attorney.

Mary Soltis and Nettie Goerka also testified to similar crimes involving Walter or Eli, but they made no identification of defendant.

Officer Baldwin of the Cicero police testified that he had conducted the lineup viewed by Ms. Prerost and Ms. Metlicka on February 25, 1985. Each woman viewed the lineup separately with Officer Tamos. On cross-examination, Officer Baldwin admitted that the three suspects were the three shortest in the six-man lineup, numbers 1 and 3 possibly being as much as 8 to 10 inches taller than the suspects, although he could not say definitively how much taller they were. Prisoners were used, although he thought another officer had searched the streets for men for the lineup. No suitable persons were found, as persons on the street in mid-afternoon when the lineup occurred were all younger than the suspects. Numbers 1, 3, and 5 all had lighter complexions than the suspects. The officer thought the lineup was fair. Officer Baldwin also selected the photographs for the arrays shown to Ms. Bogdanowicz, Ms. Hruby, and Ms. Bell. One picture was of a man who was balding and moustached, and those pictured were lighter complected than the three defendants.

Officer Tamos of the Cicero police testified that he was alone with Ms. Prerost when she identified defendant in the lineup. Her identification was made after about one minute. He said the same about Ms. Metlicka's identification. Officer Tamos testified that all six men in the lineup were white males, which he believed made the lineup fair. On cross-examination he stated that the participants were dissimilar as to height and weight, No. 1 and No. 3 possibly as much as six inches taller than the rest. As for the photo arrays, even though the men were not similar as to physical description, all were white males. Officer Tamos stated they did not have time to look for more similar lineup participants or photographs.

The judge concluded that defendant had not established that the pretrial identifications in the present case or in the other crimes were so suggestive as to raise the likelihood of irreparable misidentification. The judge concluded that the police had not indicated to the witnesses that they believed the offenders were in the lineup and each identification was made outside the presence of other witnesses and without seeing the suspects beforehand. The judge found the lineup participants were not grossly dissimilar to the defendants and, therefore, the lineup was not suggestive. He found the out-of-court and in-court identifications were reliable. He denied the motions to suppress

identification testimony of all the witnesses, except, of course, for Ms. Armalis' testimony which had already been stricken.

Defendant presented no witnesses. The trial judge found defendant and his codefendants guilty of residential burglary and theft. At the sentencing hearing, defendant's whereabouts were unknown. When asked about mitigating factors, defendant's attorney offered none. The trial judge, having read the presentencing report, sentenced defendant *in absentia* to a 15-year sentence. Walter, who was also not present, also received a 15-year sentence. Eli, who was present throughout the proceedings, received a 10-year sentence.

OPINION

IDENTIFICATIONS

Defendant first contends that he was denied due process of law because the trial judge denied his motions to suppress evidence of the out-of-court lineup identifications of Ms. Prerost and Ms. Metlicka, the out-of-court photo array identifications made by the other crimes witnesses, and all in-court identifications. Defendant contends that the identification procedures were impermissibly suggestive and, therefore, the identifications were not reliable.

The findings of the trial judge with respect to the reliability of an identification must be upheld unless against the manifest weight of the evidence. (*People v. Stringer* (1972), 52 Ill. 2d 564, 568, 289 N.E.2d 631, 633.) For identification evidence to be inadmissible, a defendant must meet the burden of proving that the identification procedures were "so unnecessarily suggestive and conducive to irreparable mistaken identification that he was denied due process of law." (*People v. Blumenshine* (1969), 42 Ill. 2d 508, 511, 250 N.E.2d 152, 154.) Whether due process has been violated in a particular case depends on the totality of the circumstances surrounding the identification. *Stovall v. Denno* (1967), 388 U.S. 293, 302, 18 L. Ed. 2d 1199, 1206, 87 S. Ct. 1967, 1972.

Suggestive confrontations are disfavored because they increase the likelihood of misidentification. (*Neil v. Biggers* (1972), 409 U.S. 188, 198, 34 L. Ed. 2d 401, 411, 93 S. Ct. 375, 382.) Where there is "a very substantial likelihood of irreparable misidentification," admission of identification evidence violates due process. (*Neil v. Biggers*, 409 U.S. at 198, 34 L. Ed. 2d at 410, 93 S. Ct. at 381.) Thus, the determination as to whether due process has been violated is two-part. "This two-part test involves an examination into, first, the suggestiveness of the identification, and, second, in the wake of a sugges-

tive out-of-court identification, the reliability of the out-of-court identification and later in-court identification." *People v. Holcomb* (1989), 192 Ill. App. 3d 158, 172, 548 N.E.2d 613, 624.

The reliability factors to be considered in determining the likelihood of misidentification include:

> "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Neil v. Biggers*, 409 U.S. at 199-200, 34 L. Ed. 2d at 411, 93 S. Ct. at 382.

See also *People v. Slim* (1989), 127 Ill. 2d 302, 307-08, 537 N.E.2d 317, 319.

Considering the lineup first, defendant contends that the three suspects were the only short and dark lineup participants, making the lineup unnecessarily suggestive. Defendant implies that this suggestiveness was unnecessary, stating that the police believed the lineup to be fair as it was constituted and it is unclear whether the police attempted to find men with physical attributes more similar to those of the three suspects.

We note, first of all, that the lineup photograph, which was available to the trial judge, was not submitted to this court with the reconstructed record. Therefore, we have only the statements made during the trial on which to rely. While some cases have found lineups to be unnecessarily suggestive where there was a discrepancy between the height of a suspect and that of other lineup participants, the cases provide no clear-cut guidelines as to how much of a discrepancy is permissible or what other circumstances, if any, need also be present.

In *Foster v. California* (1969), 394 U.S. 440, 22 L. Ed. 2d 402, 89 S. Ct. 1127, defendant was six or seven inches taller than the other lineup participants. The identification procedures were found to have undermined reliability so as to violate due process. (*Foster*, 394 U.S. at 443, 22 L. Ed. 2d at 407, 89 S. Ct. at 1129.) However, there were several circumstances other than the height discrepancy which were more likely responsible for the Court's finding. It was a three-man lineup in which the defendant was the only one wearing a jacket like the one the offender wore at the robbery. The witness was unsure, so the police arranged a face-to-face meeting with only the defendant, followed by a new lineup consisting of defendant and four men who had not been in the first lineup. (*Foster*, 394 U.S. at 441-42, 22 L. Ed. 2d at 405-06, 89 S. Ct. at 1128.) The Court found that the identifica-

tion procedures made it inevitable that the witness would identify the defendant, regardless of whether he was actually the offender. *Foster*, 394 U.S. at 443, 22 L. Ed. 2d at 407, 89 S. Ct. at 1129.

In *People v. Wyatt* (1974), 23 Ill. App. 3d 587, 319 N.E.2d 575, the defendant was 6 feet 4 inches tall, while others in the lineup ranged in height from 5 feet 9 inches to 6 feet 0 inches. There were also some other physical differences. (*People v. Wyatt*, 23 Ill. App. 3d at 592, 319 N.E.2d at 578.) The court found the identification was properly admitted. *People v. Wyatt*, 23 Ill. App. 3d at 593, 319 N.E.2d at 579.

■ Although the record indicates that at least two of the lineup participants were taller than the suspects, it is not clear how much taller they were. The record shows that one of the men was close in height to the suspects. "It is not required that all men placed in a lineup must be physically identical, and differences in size among them (if not too great) are of little consequence." (*People v. Harrison* (1978), 57 Ill. App. 3d 9, 13, 372 N.E.2d 915, 919.) We note that the trial judge in the present case stated on the record that the lineup participants "were not grossly dissimilar in appearance to the suspect."

It appears that the other three men in the lineup were also lighter complected than defendant and his codefendants. Defendant and his codefendants were represented by defendant's appellate counsel to be Gypsies with dark, swarthy complexions. Defendant relies on *People v. Boyd*, in which a witness described the two offenders as Indians. (*People v. Boyd* (1974), 22 Ill. App. 3d 1010, 1016, 318 N.E.2d 212, 215.) The witness, having been told there were two suspects in the reviewing room, identified the two defendants who were the only Indians in the room. However, unlike the present case, the defendants were also the only persons dressed as the offenders had been dressed at the time of the crime. (*People v. Boyd*, 22 Ill. App. 3d at 1018, 318 N.E.2d at 218.) The court found the identification procedures were impermissibly suggestive. *People v. Boyd*, 22 Ill. App. 3d at 1018, 318 N.E.2d at 218.

In this case, Ms. Prerost and Ms. Metlicka did not describe the offenders as being Gypsies, but only as dark and swarthy. Therefore, the fact that defendant and his codefendants were the only Gypsies in the lineup cannot, by itself, be determinative because the witnesses were not specifically looking for Gypsies. While the record indicates the other participants were of lighter complexion, we do not have the lineup photograph to review to determine how great the difference was, and the testimony at trial does not provide a basis for concluding

that the difference was significant. We repeat that the trial judge stated he did not find the lineup participants to be grossly dissimilar in appearance to the suspects.

In *People v. Richardson* (1988), 123 Ill. 2d 322, 528 N.E.2d 612, *cert. denied* (1989), 489 U.S. 1100, 103 L. Ed. 2d 943, 109 S. Ct. 1577, the court considered the suggestiveness of a photographic array. The trial judge had stated there was nothing suggestive about the photographs themselves. The photographs were lost prior to appeal. Our supreme court stated, "This court will normally defer to a lower court's factual finding [citation], and given the facts here, we cannot conclude that defendant has established the photographs' suggestiveness." (*People v. Richardson*, 123 Ill. 2d at 348-49, 528 N.E.2d at 621-22.) Similarly, in the absence of the lineup photographs and any definitive testimony as to the magnitude of the physical dissimilarities, we must rely on the determination of the trial judge, who saw the photograph, that the physical differences between the suspects and the other lineup participants, including height and coloring, were not significant enough to cause the lineup to be unnecessarily suggestive.

Defendant also points out that Ms. Metlicka testified that she was told to identify three men and that her attention was drawn to the short men. We note that Ms. Metlicka's testimony was contradictory as to whether the police told her to select three persons. Officer Tamos testified only that he asked each woman if there was anyone in the lineup whom they recognized as having been in the house. The trial judge found that there was no suggestion to the witnesses that the suspects were in fact in the lineup. The trier of fact is in the best position to judge the credibility of witnesses and to determine the weight to be given to each witness' testimony. A reviewing court should not reverse a conviction "unless the evidence is so unreasonable, improbable, or so unsatisfactory as to justify a reasonable doubt of the defendant's guilt." *People v. Reid* (1990), 136 Ill. 2d 27, 61, 554 N.E.2d 174, 190.

We note further that when Ms. Metlicka was asked if she looked for three short men, she responded, "Yes, I remember they were short." This response indicates the witness was relying on her own memory and, therefore, supports the conclusion of the trial judge that the identification was not the result of improper police suggestion. This conclusion was not against the manifest weight of the evidence.

Even if the trial judge had found the lineup procedures improperly suggestive, the pretrial identifications by Ms. Prerost and Ms. Metlicka would still have been admissible on the basis of the trial judge's determination that the reliability factors in *Neil v. Biggers*,

stated earlier in this opinion, were satisfied. (*Neil v. Biggers*, 409 U.S. at 199-200, 34 L. Ed. 2d at 411, 93 S. Ct. at 382.) As to the opportunity to view the criminal at the time of the crime, the testimony reflects that the three men were in the apartment for some time—at least long enough to heat a pail of water on the stove, empty it, refill it, and place it back on the stove. The incident took place during daylight hours. Ms. Prerost testified that her vision was good at the time, and Ms. Metlicka's vision on that day was not questioned. Ms. Metlicka saw defendant enter the apartment shortly after the other two men entered. She saw her sister hand a glass of water to defendant, although her testimony was conflicting as to whether or not she also saw defendant leaving the bedroom. They had ample opportunity to view defendant. As to degree of attention, there is no indication that Ms. Metlicka was distracted while she saw defendant. Ms. Prerost's attention was focused on defendant when he spoke to her, and they stood face-to-face when she handed him a glass of water.

The women's prior descriptions of the offenders were general: all three were dark and swarthy, short, one (defendant) being somewhat taller than the other two, one heavier than the other two, all with dark hair. "[A] witness' positive identification can be sufficient even though the witness gives only a general description based on the total impression the accused's appearance made." *People v. Slim*, 127 Ill. 2d at 309, 537 N.E.2d at 320.

As for length of time between the crime and the confrontation, the lineup was conducted only three days after the crime. As for level of certainty demonstrated at the confrontation, although Ms. Prerost was admittedly somewhat puzzled at first, both women positively identified the defendant. Officer Tamos indicated the identifications were certain and were made after about one minute of viewing the lineup.

We note that there was no indication in the record that the defendant's actual description differed from the pre-lineup descriptions given to police. Nor was there any identification by photograph prior to the lineup or any previous failure to identify the offenders. See *People v. Blumenshine*, 42 Ill. 2d at 514, 250 N.E.2d at 155 (citing those factors as considerations in determining whether an identification has independent origin).

The trial judge recited the factors in *Biggers* and found the testimony in the present case showed conclusively that the factors had been adequately met. This finding was not against the manifest weight of the evidence. Therefore, defendant has not met his burden of proving that under the totality of the circumstances the pretrial

lineup identification posed a very substantial likelihood of irreparable misidentification. (See *Neil v. Biggers*, 409 U.S. at 198-99, 34 L. Ed. 2d at 410-11, 93 S. Ct. at 381-82.) Once admissible, any shortcoming in the identification procedures or the testimony goes to the weight of the evidence. *Manson v. Brathwaite* (1976), 432 U.S. 98, 116, 53 L. Ed. 2d 140, 155, 97 S. Ct. 2243, 2254.

We turn next to the in-court identifications made by Ms. Prerost and Ms. Metlicka. Defendant first contends that, the pretrial identifications being inadmissible because they were unnecessarily suggestive, the in-court identifications are also inadmissible because they did not have an independent origin.

> "Where a defendant has presented sufficient evidence to establish the unfairness of a pre-trial confrontation, an in-court identification may be admitted into evidence only if it is shown that it had an independent origin arising from the witness' uninfluenced observation of the accused. [Citation.] The State must prove the uninfluenced origin of the in-court identifications by clear and convincing evidence." (*People v. Calhoun* (1973), 11 Ill. App. 3d 600, 603-04, 297 N.E.2d 304, 306.)

Because we find the pretrial lineup evidence admissible, we need not address the question of whether the in-court identifications had an independent origin, although we note that the above analysis as to the reliability of the lineup identifications would also apply to validate the in-court identifications.

Defendant further attacks the reliability of the in-court identifications because both Ms. Metlicka and Ms. Prerost were allowed to leave the stand and walk around the courtroom, identifying defendant and his codefendants at close range. Defendant points out that Ms. Prerost had recently undergone eye surgery. We think that, given the fact that both women were in their sixties, it was appropriate for the trial judge to allow them to approach persons in the courtroom. The in-court identifications of defendant were made with certainty. That the women may, or may not, have been able to make an identification from the witness stand goes only to the weight of the evidence, not to its admissibility.

Next, we deal with the pretrial identifications of defendant, made during photo arrays, by Ms. Bell and Ms. Bogdanowicz, witnesses to other crimes. The standard for determining the admissibility of pretrial photo array identifications is the same as that for lineups, *i.e.*, whether or not the "identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." (*People v. Collins* (1988), 176 Ill. App. 3d 169,

175, 530 N.E.2d 1143, 1147.) Defendant contends that the photographs used were unnecessarily suggestive because the police, who knew the suspects were Gypsies, made no attempt to select photographs of persons resembling the suspects. Officer Tamos testified that the police did not have time to look for pictures of persons more physically similar to the suspects and that he thought the array was fair because all photos were of white males.

As with the lineup photograph discussed earlier, the photographs used in the photo arrays were not submitted with the reconstructed record. While there was testimony that the other men pictured in the photo arrays were dissimilar to defendant in terms of height, complexion, and some other characteristics, the testimony itself is not definitive as to how great the discrepancies were. Therefore, as with the lineup discussed earlier, we must defer to the trial court's finding that the police used no illegal procedures, intentional or otherwise, to prejudice defendant.

We further note that, even if the photo arrays had been impermissibly suggestive, the witnesses had an independent basis for their identification. Ms. Bell spent 5 or 10 minutes with defendant while he made her tap on burners, her attention being drawn directly to him when they spoke and he handed her knives three or four times. They also walked together from the apartment to the basement. It was midday, so the lighting would have been adequate in the apartment and on the steps. Although she viewed the photos approximately four months after the crime committed in her home, where, as here, the certainty of identification was adequate and there were no prior identifications made, the time lapse will not render the identification inadmissible. See *Neil v. Biggers*, 409 U.S. at 201, 34 L. Ed. 2d at 412, 93 S. Ct. at 383 (lapse of seven months was acceptable).

As for the identification by Ms. Bogdanowicz, she also had adequate opportunity to view defendant when he entered her apartment and later, when she noticed him in her bedroom as she stood at the bedroom door. The photo array was conducted approximately two weeks after the crime in her home was committed. Defendant states that she gave only a vague description after the crime, saying the offenders were dark complected, resembling Mexicans. She could not recall what they wore. As stated earlier, a general description based on an overall impression can be sufficient. (See *People v. Slim*, 127 Ill. 2d at 309, 537 N.E.2d at 320.) Her failure to provide a more exact description goes to the credibility and weight of the evidence which the trial judge was in the best position to appraise.

Defendant implies that the police procedures were suggestive because no Polish interpreter was provided for Ms. Bogdanowicz when she viewed the photo array. Defendant fails to point out, and we fail to see, specifically how that would necessarily cause suggestiveness. Defendant cites no authorities for this proposition. We note that while Ms. Bogdanowicz spoke through an interpreter in court, she testified that she understood English.

Because defendant has not shown the pretrial photo array to be unnecessarily suggestive, defendant's contention that the in-court identification by Ms. Bell was inadmissible because it lacked an independent origin must also fail.

We find that defendant has not met his burden of proving that under the totality of the circumstances any of the identification procedures were "so unnecessarily suggestive and conducive to irreparable mistaken misidentification that he was denied due process of law." (*People v. Blumenshine*, 42 Ill. 2d at 511, 250 N.E.2d at 154.) His motion to suppress the identifications was properly denied by the trial court.

OTHER CRIMES EVIDENCE

Defendant's next contention is that the trial court erroneously admitted evidence of other crimes. In reference to defendant, the trial judge admitted the testimony of Beatrice Bell and Libby Hruby regarding a theft in their apartment building and the testimony of Sophie Bogdanowicz regarding a theft in her apartment. The State offered the testimony to prove defendant's intent in the commission of the crime charged. The trial court stated that the evidence was relevant to prove intent, identity, and *modus operandi*. Defendant argues that the other crimes evidence was inadmissible for those purposes and was, in fact, introduced to show defendant's propensity for crime.

"Evidence of crimes for which a defendant is not on trial is inadmissible if relevant merely to establish his propensity to commit crime." (*People v. Thingvold* (1991), 145 Ill. 2d 441, 452, 584 N.E.2d 89.) However, evidence of other crimes committed by defendant is admissible if relevant to any other material question, such as intent, identity, motive, *modus operandi* or absence of mistake. (*People v. McKibbins* (1983), 96 Ill. 2d 176, 182, 449 N.E.2d 821, *cert. denied* (1983), 464 U.S. 844, 78 L. Ed. 2d 136, 104 S. Ct. 145.) The evidence must tend to show that the other crime was committed, or participated in, by the defendant, but it need not be proved beyond a reasonable doubt. (*People v. Thingvold*, 145 Ill. 2d at 455-56, 584 N.E.2d at 95.) As with other kinds of evidence, in determining admissibility

the trial judge must balance the relevancy of the evidence against the possible prejudicial effect. A trial judge's ruling that the evidence is admissible will not be reversed absent a clear showing of abuse of discretion. *People v. Thingvold*, 145 Ill. 2d at 452-53, 584 N.E.2d at 93-94.

Where other crimes evidence is offered to show the presence of criminal intent or the absence of an innocent frame of mind during the commission of the crime charged, there must be some threshold similarities between the crimes so that the evidence is relevant. (*People v. Bartall* (1983), 98 Ill. 2d 294, 310, 456 N.E.2d 59, 67.) It is sufficient that there are general areas of similarity. (*People v. McKibbins*, 96 Ill. 2d at 185-86, 449 N.E.2d at 825.) In *People v. Peebles* (1983), 114 Ill. App. 3d 684, 449 N.E.2d 230, the defendant was charged with theft and conspiracy to commit theft by obtaining State warrants through filing fraudulent tax rebate applications. (*People v. Peebles*, 114 Ill. App. 3d at 685-86, 449 N.E.2d at 231.) Evidence that defendant had cashed several other fraudulently obtained warrants, some issued as much as nine months before the date of the crime charged, was held to be admissible for the purpose of proving specific intent. *People v. Peebles*, 114 Ill. App. 3d at 691-92, 449 N.E.2d at 234-35.

In *People v. Clark* (1956), 9 Ill. 2d 46, 137 N.E.2d 54, *cert. denied* (1957), 352 U.S. 1002, 1 L. Ed. 2d 546, 77 S. Ct. 559, a defendant was charged with larceny by embezzlement. The defendant had wrongfully converted a cashier's check under the guise of applying the proceeds toward the costs associated with the victim's mortgage. (*People v. Clark*, 9 Ill. 2d at 54, 137 N.E.2d at 58.) Evidence that defendant wrongly converted funds in previous real estate transactions was admissible for the purpose of showing defendant's intent. Our supreme court stated:

> "Where a specific intent is an essential element of a crime and the prosecution must prove this specific intent in order to secure a legal conviction, evidence of similar acts committed by the accused, happening at or about the same time, is relevant and competent to show such intent. *** Defendant argues that the similar acts proved here were too remote from a standpoint of time to be admissible or competent. All of said acts, however, occurred within a two-year period of time prior to the act of embezzlement for which defendant was tried." *People v. Clark*, 9 Ill. 2d at 56, 137 N.E.2d at 59.

Just as the evidence of similar crimes was admissible in *People v. Peebles* and *People v. Clark* to establish intent, the evidence of the other crimes committed by defendant in this case is similarly ad-

missible to establish intent. In each of the other two crimes, as in this crime, these three defendants secured admittance to the homes of elderly Cicero residents under the guise of performing home repairs, using that as an opportunity to commit theft. The intent established in the other two crimes helps establish the intent in the case at bar.

It is clear from the comments of the trial judge that he considered the other crimes evidence not only for intent, but also to establish identity through *modus operandi*. "The *modus operandi* exception has been recognized as circumstantial evidence of identity on the basis that crimes committed in a similar manner suggest a common author and strengthen the identification of a defendant. [Citations.] It is especially proper where the defendant's identity is a central issue in the case." *People v. Holcomb*, 192 Ill. App. 3d at 169, 548 N.E.2d at 622.

The offenses must be so similar that evidence of one crime tends to prove the defendant is guilty of the crime charged. (*People v. McKibbins,* 96 Ill. 2d at 185, 449 N.E.2d at 825.) However, the crimes need not be identical or "so distinctive as to amount to a 'signature.'" (*People v. Bryan* (1987), 159 Ill. App. 3d 46, 51-52, 511 N.E.2d 1289, 1293.) "[T]he State must make a strong and persuasive showing of a similarity in the crime charged and the separate offense which establishes between the two offenses a meaningful link, shown by some distinctive feature not common to most offenses." (*People v. Holcomb*, 192 Ill. App. 3d at 169, 548 N.E.2d at 622.) Some dissimilarities will always exist between crimes. (*People v. Taylor* (1984), 101 Ill. 2d 508, 521, 463 N.E.2d 705, 712, *cert. denied* (1984), 469 U.S. 866, 83 L. Ed. 2d 140, 105 S. Ct. 209.) The trend in Illinois is that the similarities must outnumber the differences, not that the crimes must be alike in every respect. *People v. Houston* (1992), 240 Ill. App. 3d 754, 764, 608 N.E.2d 46, 52; see *People v. Emmett* (1975), 34 Ill. App. 3d 167, 168-69, 340 N.E.2d 235, 238 (evidence admitted for *modus operandi* where each crime was committed in same geographic area 12 days apart and involved defendant following victims from elevator to victims' apartments then committing similar sexual assaults at knifepoint); see also *People v. Stevenson* (1990), 204 Ill. App. 3d 342, 347, 562 N.E.2d 330, 333 (*modus operandi* evidence admissible where each crime involved a battery committed in same geographic area in which defendant silently faced slightly built male victim, striking him with a weapon).

In the present case, evidence of two other crimes was offered and admitted against the defendant. While there was additional testimony of other crimes admitted against his codefendants, we note that the trial judge indicated he would separately consider the other crimes ev-

idence offered against each defendant. The evidence of the two crimes offered against the defendant was substantially similar to the crime charged. All three crimes took place at apartments in Cicero in the early afternoon. Each involved the theft of cash from an elderly woman who lived alone, although two occurred during a visit from the woman's elderly sister. In each case these three codefendants entered the apartment under the guise of doing some kind of repair work, two of the three incidents involving a request for water. No repairs were ever made. In each case, one man would attempt to distract each woman. As previously noted, the crimes occurred within approximately a four-month period, two being only two weeks apart. While we acknowledge that access to a residence is often gained by posing as a repairman, we do not think that the similarities in this case are of the type common to most residential burglaries. The similarities were substantial and distinctive enough that it was proper for the trial judge to consider the evidence of other crimes to show *modus operandi*.

Defendant also argues that, even if the other crimes evidence was admissible to show intent or *modus operandi*, the trial court should have refused to admit such testimony because its probative value is outweighed by its prejudicial effect on defendant. Defendant states that the other crimes evidence included the testimony of six witnesses and constituted at least one-third of the trial time. Defendant maintains that the cumulative impact of all the other crimes evidence was to prejudice defendant.

A trial court should limit evidence of another crime to that evidence which is relevant to the issue on which the other crime is admitted. (*People v. Bartall*, 98 Ill. 2d at 315, 456 N.E.2d at 69.) The trial judge must weigh the relevance of the evidence, in light of the purpose for which it is being offered, against the prejudicial effect upon the defendant. (*People v. Stewart* (1984), 105 Ill. 2d 22, 62, 473 N.E.2d 840, 860, *cert. denied* (1991), 502 U.S. 853, 116 L. Ed. 2d 126, 112 S. Ct. 162.) "[T]he extent to which cumulative evidence may be received rests within the discretion of the trial court." (*People v. Partee* (1987), 157 Ill. App. 3d 231, 268, 511 N.E.2d 1165, 1190, *cert. denied* (1988), 484 U.S. 1072, 98 L. Ed. 2d 1006, 108 S. Ct. 1043.) Each crime presented in the present case was relevant to show intent or identity as to at least one defendant. We conclude that the trial judge did not abuse his discretion in determining that the evidence was not unwarranted in establishing the identities and state of mind of the defendants, and in determining that its prejudicial impact did not outweigh its probative value. See *People v. Breton* (1992), 237 Ill.

App. 3d 355, 363, 603 N.E.2d 1290, 1296 (trial court did not abuse its discretion in admitting evidence of other crimes where each contested item of evidence advanced State's theory as to motive).

Although defendant did not address the matter in his brief, in oral argument he contended he was prejudiced because the judge considered the other crimes testimony of Ms. Armalis, whose testimony was stricken. The judge stated, "The sworn testimony from numerous other witnesses denotes the following pattern: entrance into the homes of these victims, as stated for the record, by these three defendants, by the ruse, either to offer repairs for the premises of these victims and/or to locate a broken water pipe, or to locate a gas main."

While the repair ruse involved water in all but two of the crimes, the record indicates that only one crime involved an alleged leak in a water pipe. That crime was the one described in Ms. Armalis' testimony. That testimony had been offered against defendant. The judge's comment would seem to indicate that he had considered incompetent evidence. However, we do not find that this error necessitates reversal.

In *People v. Richardson*, our supreme court found that certain other crimes evidence was admitted in error. However, reversal was not required. The court quoted Supreme Court Rule 615(a), which states " '[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded.' " (*People v. Richardson*, 123 Ill. 2d at 343, 528 N.E.2d at 619, quoting 107 Ill. 2d R. 615(a).) The court pointed out that there had been no extensive discussion of the collateral crime and it relied on the existence of positive and credible identification testimony to determine that the outcome would not have been different. The court stated, "Where it does not appear that justice has been denied or that a finding of guilt resulted from an error, we will not reverse a defendant's conviction." *People v. Richardson*, 123 Ill. 2d at 344, 528 N.E.2d at 619.

In the present case, we note that Ms. Armalis identified defendant on direct examination, but commented that the two men sitting together looked like twins. On cross-examination she changed her identification testimony to indicate that Walter, not defendant, was the one she recognized. On redirect, she reiterated that it was Walter. In arguing that the court should strike Ms. Armalis' identification testimony, defendant's counsel stated that although the State had offered the testimony only as to defendant, in fact, "[a]ll her testimony is prejudicial to Walter." Considering the content of Ms. Armalis' testimony, we will not presume that the judge's comment was prejudicial

to defendant. Furthermore, at best such evidence would have been cumulative, the judge having already found the identification testimony of Ms. Metlicka and Ms. Prerost to be credible as well as having found the testimony of witnesses regarding the other crimes to be credible. Therefore, it appears that the error was harmless.

ORDER TO EXCLUDE WITNESSES

Defendant next contends that he was denied a fair trial when the trial judge failed to conduct a hearing during which witnesses other than Ms. Armalis could be questioned regarding any possible discussion of the case among them. At the beginning of the trial, the judge granted a motion to exclude witnesses. The trial judge also admonished each witness, whenever there was a break in the testimony or the witness finished testifying, not to discuss the case with anyone. He further ordered that Officers Tamos and Baldwin not transport Ms. Prerost and Ms. Metlicka to and from court.

During cross-examination Ms. Armalis testified that when the witness named Lillian (Ms. Prerost) left the courtroom she asked Lillian if "they" were there, presumably meaning the defendants in the case. She received an affirmative answer. She also testified that the woman had told her Bob Miller's name, but had not told her anything else. After a sidebar discussion, Ms. Armalis was cross-examined extensively as to whether the witnesses had discussed the case on any other occasion, either when they were waiting to testify or while they traveled to and from the courthouse. At that time she testified that it was Beatrice (Ms. Bell) to whom she spoke, not Lillian. Officer Baldwin had driven her to and from court with Ms. Bell and Ms. Hruby only. She had only met Lillian and her sister while waiting to testify. Other than asking Ms. Bell if "they" were in the courtroom, she had not discussed the case with anyone, nor had she heard any of the witnesses discuss the case.

Defendant requested that the identification testimony of Ms. Armalis be stricken and that the other witnesses be questioned as to possible communication about the case. The trial judge struck Ms. Armalis' testimony, but told the parties they would have an opportunity to look into the matter later. The record shows no indication that either party made any further request on the subject.

This situation is similar to that in *People v. Schott* (1976), 39 Ill. App. 3d 266, 350 N.E.2d 266. In that case, all witnesses sat in the same room outside the courtroom. One witness testified that he had spoken to two other witnesses who had previously testified. He stated, "They told what happened *** said it wasn't as difficult as they thought it would be." (*People v. Schott*, 39 Ill. App. 3d at 273-74, 350 N.E.2d at 55.) He

did not recall being told what questions had been asked. (*People v. Schott*, 39 Ill. App. 3d at 274, 350 N.E.2d at 55.) The witness was not questioned further, nor were the two previous witnesses questioned, as to the conversation among them. The trial court denied defendant's motion for a mistrial based on violation of the order excluding witnesses. The reviewing court stated that the conversation was, at best, an indirect violation of the order to exclude witnesses. (*People v. Schott*, 39 Ill. App. 3d at 274, 350 N.E.2d at 55.) The court pointed out that it is within a trial court's discretion to admit the testimony of a witness who has violated an exclusion order. (*People v. Schott*, 39 Ill. App. 3d at 274, 350 N.E.2d at 56.) The reviewing court found no abuse of discretion on the part of the trial court in denying the motion for mistrial and permitting the testimony of the three witnesses to stand. *People v. Schott*, 39 Ill. App. 3d at 274, 350 N.E.2d at 56.

■ As in *People v. Schott*, it was within the trial judge's discretion to allow the testimony of the previous witnesses to stand, particularly since defendant did not seek to question those witness after the court had indicated there would be such an opportunity later. The trial court was not compelled to remind defendant of its statement to that effect. We find no abuse of discretion on the trial judge's part.

PROOF OF GUILT BEYOND A REASONABLE DOUBT

Defendant contends that the State failed to prove him guilty beyond a reasonable doubt because Ms. Prerost and Ms. Metlicka were blatantly hostile to the proceedings, their identifications were vague, and their testimony and the testimony of Officers Baldwin and Tamos was contradicted and unbelievable. The record shows that Ms. Prerost was irritable and, at times, cantankerous. Ms. Metlicka was much less so. A witness' irritability and negative attitude are but factors to be considered by the trial judge in assessing the credibility of the witness. Similarly, the degree of vagueness or contradiction in a witness' testimony is also included in the many factors to consider. "The credibility of a witness and the weight and value of his testimony often involve consideration of a variety of facts and circumstances, such as the appearance of the witness, his demeanor while testifying, his frankness or candor, his feeling of hostility to either of the parties or of undue friendliness to one or the other." (*North Chicago Street R.R. Co. v. Anderson* (1898), 176 Ill. 635, 639, 52 N.E. 21, 22.) "It is the function of the trier of fact, and not the court of review, to determine the credibility of witnesses and, where the evidence is merely conflicting, the trier of fact's judgment will stand." *People v. Cooper* (1987), 164 Ill. App. 3d 734, 737, 518 N.E.2d 260, 262.

■ There is nothing in the record before us to show that, based on the testimony of the witnesses, no rational trier of fact could have found the defendant guilty beyond a reasonable doubt.

SENTENCING

Finally, defendant contends that the trial judge abused his discretion by imposing the maximum 15-year sentence for residential burglary. He states three grounds for this conclusion. First, defendant claims that the judge failed to hold a meaningful sentencing hearing because defendant was not present to offer testimony in mitigation or to oppose or object to any improper information in the presentencing investigation report which was prepared without consulting defendant. The record is clear that the trial judge properly admonished defendant during the trial that, if he absented himself from the remainder of the proceedings, the trial would proceed and he could be convicted and sentenced *in absentia.* (See *People v. Marks* (1992), 239 Ill. App. 3d 178, 182, 607 N.E.2d 286, 288.) Section 115—4.1(c) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1991, ch. 38, par. 115—4.1(c)) permits the court to conduct a sentencing hearing *in absentia* where a defendant has been found guilty *in absentia.*

■ The argument which defendant makes failed in *People v. Burcham* (1991), 208 Ill. App. 3d 939, 566 N.E.2d 832. The court stated, " 'The loss to the defendant of benefits otherwise available [such as challenging the accuracy of the evidence at the sentencing hearing or informing his attorney that the evidence is inaccurate] may be viewed as one additional cost of his wilful failure to appear for trial as directed.' " (*People v. Burcham,* 208 Ill. App. 3d at 943, 566 N.E.2d at 835, quoting *People v. Emery* (1989), 190 Ill. App. 3d 171, 174, 546 N.E.2d 658, 660.) Since defendant voluntarily absented himself after being admonished of the consequences, he cannot now complain that the sentencing judge should not have relied on the information available to him.

Secondly, defendant contends that the sentence was disproportionate to the offense because the crime was nonviolent in nature. He contends that because he and his codefendant, Walter Miller, each received 15-year sentences while Eli Miller, who was present throughout, received only a 10-year sentence, defendant was improperly penalized for absconding during the trial.

The fact that no violence occurred in the crime charged is an important factor, but there are many other factors which a sentencing court can also consider including defendant's demeanor, general moral character, mentality, social environment, habits, age, and criminal record. (*People v. Heredia* (1989), 193 Ill. App. 3d 1073, 1083, 550 N.E.2d 1023,

1029.) The judge must balance the retributive and rehabilitative purposes of incarceration. *People v. Center* (1990), 198 Ill. App. 3d 1025, 1034, 556 N.E.2d 724, 729.

Disparate sentencing of codefendants is not permitted where arbitrary and unreasonable. (*People v. Kline* (1982), 92 Ill. 2d 490, 508, 442 N.E.2d 154, 162.) While the record does not expressly show that the judge considered defendant's abscondence in his sentencing, it would not have been improper for him to do so. Such information reflects on defendant's potential for rehabilitation. In *People v. Kendall* (1991), 213 Ill. App. 3d 782, 572 N.E.2d 362, the sentencing court had commented that while a juvenile, defendant had attempted to escape from the Department of Corrections and that while on adult probation for theft, he had left the jurisdiction. The appellate court found it appropriate to consider such information in sentencing the defendant, as it strongly indicated a lack of rehabilitative potential. *People v. Kendall*, 213 Ill. App. 3d at 788, 572 N.E.2d at 366.

Furthermore, disparate sentences can be warranted by differences in the nature and extent of participation in the crime or by differences in the criminal records. (*People v. Wolfe* (1987), 156 Ill. App. 3d 1023, 1028, 510 N.E.2d 145, 149.) Defendant has not provided this court with the criminal records of his codefendants. As a result, this court has no basis upon which to make any comparison among the codefendants. We must, therefore, presume that the trial judge followed the law in his sentencing order and did not abuse his discretion. See *People v. Smith* (1989), 178 Ill. App. 3d 976, 984, 533 N.E.2d 1169, 1174 (trial judge is presumed to know the law, unless the record affirmatively shows the contrary).

Defendant's third contention is that his sentence was excessive because the judge failed to consider his rehabilitative potential. He claims that, because his prior convictions resulted in sentences of probation rather than imprisonment, his potential for rehabilitation through incarceration has never been tested. He states that the trial judge failed to explain how the maximum 15-year sentence would provide an incentive for rehabilitation for a person who, like defendant, has never been incarcerated.

We note, first of all, that a trial judge need not recite on the record each factor in support of the sentence. (*People v. Griffiths* (1983), 112 Ill. App. 3d 322, 330-31, 445 N.E.2d 521, 528.) As mentioned above, the absence of violence in the commission of the crime is not the only factor to be considered. Defendant's presentence investigation report shows a conviction for grand theft in 1975 for which defendant received three years' probation and a conviction for theft in 1980 for which he received

18 months' probation. Evidence of additional crimes had been presented at trial. Such information is relevant as reflecting on defendant's character. (*People v. Stewart* (1984), 105 Ill. 2d 22, 68-69, 473 N.E.2d 840, 863, *cert. denied* (1985), 471 U.S. 1131, 86 L. Ed. 2d 283, 105 S. Ct. 2666.) We think it also indicates that probation was an unsuccessful rehabilitative method in defendant's case. Under these circumstances, the court could properly conclude that the sentence it imposed would provide an incentive for rehabilitation.

A trial judge's sentencing decision is entitled to great deference. Absent an abuse of discretion, a sentence will not be altered on review. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 154, 368 N.E.2d 882, 884.) We find the trial court did not abuse its discretion in imposing the maximum sentence in this case.

MOTION TO STRIKE APPELLEE'S BRIEF

Defendant has filed a motion with this court asking that the State's brief be stricken and the issues decided based solely on defendant's brief. The motion was taken with the oral hearing of this case. It appears that the original record of the trial proceedings in this case was lost. A reconstructed record was submitted. Defendant asks us to strike the State's brief because the references to pages in the record do not refer to the reconstructed record. As further grounds, defendant states that certain portions of the brief refer to codefendant Eli Miller rather than to defendant.

The reconstructed record was not so cumbersome that one could not locate testimony to which the State referred in its brief. We also note that the references applying to Eli Miller rather than to defendant were minimal and easily discernible upon reading of the record. The original record having been lost through what appears to be no fault of either party, we do not find the references in the State's brief to be a purposeful violation of Supreme Court Rule 341, which governs the content of appellate briefs. (134 Ill. 2d R. 341.) We decline to penalize the State for referring in its brief to the pages of the original record. As for the statements which pertain to Eli Miller, such statements have been disregarded. Defendant's motion to strike the State's brief is denied.

For the foregoing reasons, the judgment of the circuit court is affirmed.

Affirmed.

McNULTY and MURRAY, JJ., concur.