2020 IL App (2d) 180479-U
No. 2-18-0479
Order filed February 24, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Lake County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 00-CF-1920 |
| | ) | |
| MARVIN T. WILLIFORD, | ) | Honorable |
| | ) | Daniel B. Shanes, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE HUDSON delivered the judgment of the court.
Justices Burke and Schostok concurred in the judgment.

**ORDER**

¶ 1    *Held*: Trial court did not manifestly err in denying defendant's petition for postconviction relief in that (1) new DNA evidence did not exculpate defendant where original jury was aware that existing DNA evidence did not link defendant to crime; (2) trial court was entitled to attribute limited weight to expert testimony on eyewitness identification; (3) new evidence concerning motive was not exculpatory and, to the extent it constituted impeachment of a State's witness, not exculpatory; (4) defendant failed to establish that identification was so unreliable as to offend due process; and (5) purported failure by defendant's attorney to challenge identification was not prejudicial in light of requirements of *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

¶ 2                                         I. INTRODUCTION

¶ 3    Defendant, Marvin Williford, appeals the denial of his petition filed pursuant to the Postconviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2014)) following the third stage of postconviction proceedings, raising two main errors. First, he contends that evidence of his actual innocence requires a new trial. This assertion relies on three subarguments: (1) new exculpatory DNA evidence exists; (2) new scientific evidence undermines the eyewitness testimony presented by the State at defendant's trial; and (3) new evidence indicates a motive for the crime other than that implied at trial and it impeaches a witness presented by the State. Second, defendant argues that the identification evidence presented by the State was unreliable and that his trial attorney was ineffective for not seeking to suppress it. For the reasons that follow, we affirm.

¶ 4    Before proceeding further, we note that the State has filed two motions to strike portions of defendant's brief. First, it asserts that defendant's statement of facts is argumentative. It is not sufficiently so as to hinder our review; therefore, this motion is denied. Second, the State moves that we strike any reference to the fact that one of the DNA profiles recovered from the crime scene in this case matched the DNA profile of the offender in *People v. Rivera*, 2011 IL App (2d) 091060—the unsolved murder of an 11-year-old girl. The trial court found that this was not relevant:

>    "But as I said, other than this obvious salacious value, the fact that it's not [defendant] means at [sic] the Latin people would say *ipso facto*, that it's somebody else.
>
>    Who that other person is, without any more, simply is not relevant."

We deny the State's request; however, we will give this evidence the proper consideration it is due in light of the trial court's ruling. Also, subsequent to oral argument defendant filed a motion to cite supplemental authority. The State objects to this motion. We grant this motion and will give

the authority whatever consideration is warranted, but we will not entertain any arguments not previously raised.

¶ 5                                    II. BACKGROUND

¶ 6     Defendant was convicted of first degree murder accompanied by exceptionally brutal or heinous behavior (720 ILCS 5/9-1 (West 2000)), aggravated unlawful restraint (720 ILCS 5/10-3.1 (West 2000)), armed violence (720 ILCS 5/33A-2 (West 2000)), and armed robbery (720 ILCS 5/18-2 (West 2000)) after a jury trial in the circuit court of Lake County.  Defendant's convictions are based on an incident that took place on January 22, 2000, when Delwin Foxworth, the victim, was beaten and set on fire in his home.  Three attackers entered his home.  Foxworth called one of the attackers "T"—who was found to be defendant.  Foxworth was bludgeoned with a two-by-four.  He was also lit on fire after one of the attackers bound his hands and feet with duct tape and doused him with gasoline from a red plastic gas can.  During the attack, the attackers asked for "the money or the work," which is indicated to be a reference to drugs, though there was also testimony suggesting the attack was motivated by the failure to repay a loan for a house purchase.  Foxworth ultimately died as a result of the attack over two years later.  The identity of the attackers, one of whom was alleged to be defendant, was at issue in the trial.  The identification of defendant was based primarily on the testimony of Delia Conners, Foxworth's girlfriend, who witnessed the attack.  The essential facts underlying defendant's conviction were set forth in an earlier order in this case, and we need not recount them again here.  *People v. Williford*, No. 2-08-0068, slip op. at 2-7 (2009).  New and additional material will be discussed as it pertains to the various issues raised by the parties.

¶ 7                                    III. ANALYSIS

¶ 8    As this appeal comes to us following third-stage postconviction proceedings where an evidentiary hearing was held, the manifest-error standard of review applies. *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006). Hence, we may reverse only if an error is clear, plain, and indisputable. *People v. Morgan*, 212 Ill. 2d 148, 155 (2004). A decision is manifestly erroneous only if an opposite conclusion is clearly apparent. *People v. Coleman*, 2013 IL 113307, ¶ 98. The Act allows a criminal defendant to advance a claim that he or she was denied a substantial constitutional right under the state or federal constitutions. See 725 ILCS 5/122-1(a) (West 2014). At the third stage, the defendant bears the burden of making a substantial showing of a constitutional violation. *Pendleton*, 223 Ill. 2d at 473. With these standards in mind, we now turn to defendant's arguments.

¶ 9                                        A. ACTUAL INNOCENCE

¶ 10    Defendant first argues that he has established a claim of actual innocence based on newly discovered evidence. In Illinois, "a claim of newly discovered evidence showing a defendant to be actually innocent of the crime for which he was convicted is cognizable as a matter of due process." *People v. Washington*, 171 Ill. 2d 475, 489 (1996). Relief may be granted only if a defendant brings forth evidence of actual innocence that is new, material, noncumulative, and so conclusive that it would likely result in a different verdict on retrial. *Coleman*, 2013 IL 113307, ¶ 84. Our supreme court has explained that this test should be applied thusly:

> "Substantively, in order to succeed on a claim of actual innocence, the defendant must present new, material, noncumulative evidence that is so conclusive it would probably change the result on retrial. [Citation.] New means the evidence was discovered after trial and could not have been discovered earlier through the exercise of due diligence. [Citation.] Material means the evidence is relevant and probative of the petitioner's innocence. [Citation.] Noncumulative means the evidence adds to what the jury heard.

[Citation.] And conclusive means the evidence, when considered along with the trial evidence, would probably lead to a different result. [Citation.]" *Id.* ¶ 96. The court continued:

"In practice, the trial court typically will review the evidence presented at the evidentiary hearing to determine first whether it was new, material, and noncumulative. If any of it was, the trial court then must consider whether that evidence places the evidence presented at trial in a different light and undercuts the court's confidence in the factual correctness of the guilty verdict. This is a comprehensive approach and involves credibility determinations that are uniquely appropriate for trial judges to make. But the trial court should not redecide the defendant's guilt in deciding whether to grant relief. [Citation.] Indeed, the sufficiency of the State's evidence to convict beyond a reasonable doubt is not the determination that the trial court must make. If it were, the remedy would be an acquittal, not a new trial. [Citation.] Probability, not certainty, is the key as the trial court in effect predicts what another jury would likely do, considering all the evidence, both new and old, together. [Citation.]"). *Id.* ¶ 97.

We now must apply these standards to the three classes of evidence defendant asserts indicate that he is actually innocent: DNA, scientific evidence concerning eyewitness identification, and evidence of motive that impeaches one of the State's witnesses.

¶ 11                                    1. DNA

¶ 12    At the original trial, the parties stipulated to the following:

"Kelly Gannon is a forensic scientist who conducts DNA analysis for the Northern Illinois Police Crime Laboratory in Highland Park, Illinois. The Northern Illinois Police Department requested that she examine a piece of wood with what appeared to be

bloodstains on it. She confirmed that the stain was human blood and that the DNA profile from this stain matched the DNA profile of Delwin Foxworth.

The North Chicago Police further asked Miss Gannon to analyze two stains on the clothing found on Delwin Foxworth after he was attacked and burned. One of these stains comes from Delwin Foxworth himself. The second of these stains comes from an unknown human male source. The DNA profile of Marvin Williford was developed by Ms. Gannon. She concluded to a reasonable degree of scientific certainty that the second stain could not have originated from Marvin Williford. Ms. Gannon cannot say with scientific certainty when or how the stains were placed on the clothing."

The parties further stipulated that none of the fingerprints at the crime scene that were suitable for comparison belonged to defendant. Three sets of footprints were found in the snow around the victim's house; however, none were specifically linked to defendant.

¶ 13    Subsequent to defendant's trial, additional DNA testing was conducted. Defendant points out that according to trial testimony, all three attackers handled the two-by-four. The attacker referred to as "T" (allegedly defendant) was the last person to touch the board. The additional DNA testing confirmed that Foxworth's DNA was on the board and also found three additional DNA profiles, none of which were from defendant. Trial testimony further indicated that only "T" touched the gas can. Profiles from the top and bottom of the can did not belong to defendant. A profile found on the duct tape used to restrain the victim also was not from defendant.

¶ 14    Defendant contends that his exclusion from various additional DNA profiles is exculpatory. Defendant also points out that one of the profiles from the two-by-four bludgeon indicated that it came from an individual involved in the unsolved 1992 murder of an 11-year old

girl.  See *People v. Rivera*, 2011 IL App (2d) 091060.  The trial court excluded the evidence regarding the source of this DNA, explaining:

> "As the Court found before, simple question of relevancy in the Court's mind that the question with the DNA is whether it matches Mr. Williford and the evidence suggests it does not.  It is human DNA, so logic suggests it, therefore, must be somebody else.  But who the other person is does not seem relevant in the case.  The fact that Mr. Williford is excluded from the DNA is relevant.  That's the ruling."

Parenthetically, we could not find this ruling to be an abuse of discretion (*i.e.*, no reasonable person could agree with the trial court), the controlling standard of review for evidentiary decisions (*People v. Maldonado*, 402 Ill. App. 3d 411, 416 (2010)).  Quite simply, the trial court could reasonably conclude that the fact that the person involved in this crime was previously involved in *another* crime adds nothing to *this* case.  Moreover, we know the individuals involved in this crime were capable of extreme violence given Conners' description of the attack.  What additional probative value it might have is not apparent to us.  Defendant suggests that this evidence points to a "highly plausible alternate offender"; however, it is at least equally plausible that it points to a violent coconspirator.   Moreover, trial testimony indicated all three attackers handled the bludgeon.  The trial court's ruling on relevance was clearly not an abuse of discretion.

¶ 15    The trial court rejected defendant's reliance on the new DNA testing.  Citing *People v. Rivera,* 2011 IL App (2d) 091060, ¶ 31, it first noted that "DNA, in and of itself, does not confirm the commission of a crime; rather, it confirms an individual's identity," and the exclusion from a DNA sample does not necessarily exonerate a defendant.  The trial court framed its task as determining "whether the DNA evidence was a significant factor at the defendant's trial and, thus, whether such evidence was more likely than not to have affected the jury's determination."  See

*People v. Dodds*, 344 Ill. App. 3d 513, 523 (2003). It noted that the profiles could have come from someone who handled the object before or after the crime. Hence, the trial court found that the existence of three unknown profiles did not support defendant's claim of actual innocence. Moreover, the evidence indicated that a person does not leave DNA every time he or she touches an object. Furthermore, this evidence was cumulative, in that there was evidence presented at trial that defendant was excluded from DNA samples suitable for comparison at the time. The jury's verdict was not based on DNA identifying defendant; it was rendered "in spite of evidence excluding him from the samples tested." Now, defendant has simply presented "more samples that *still* exclude [him], and yet more samples that are *still* not suitable for scientific comparison.

¶ 16   Given the deferential standard of review controlling here (see *Pendleton*, 223 Ill. 2d at 473), we cannot disturb this decision. We initially note that the parties agree that the DNA evidence generated subsequent to defendant's trial constitutes new evidence. Although the State disputes it, we have little difficulty determining that this evidence was material. This simply requires that the evidence be relevant to defendant's innocence. *Coleman*, 2013 IL 113307, ¶ 96; *People v. Gonzalez*, 2016 IL App (1st) 141660, ¶ 28. The State here points to the materially-relevant standard, which is set forth in section 116-3 of the Code of Criminal Procedure of 1963 (725 ILCS 5/116-3 (West 2018)) and concerns posttrial motions for further forensic testifying. See *People v. Johnson*, 205 Ill. 2d 381, 393 (2002). Under this statute, to be material, the evidence sought must "significantly advance" a defendant's claim of actual innocence. *Id.* at 395. However, *Coleman* defines "material" simply as relevance. *Coleman*, 2013 IL 113307, ¶ 96 ("Material means the evidence is relevant and probative of the petitioner's innocence."). Considerations such as whether the evidence significantly advances defendant's claim are more akin to the conclusiveness prong of the instant inquiry.

¶ 17 Thus, we must focus on the trial court's decision that the new DNA evidence was not conclusive evidence of defendant's actual innocence. The absence of defendant's DNA profile from the various objects tested simply does not exculpate him; indeed, it was not even inconsistent with him having handled the objects in question during the crime. Evidence was presented indicating that an individual does not always leave DNA when he handles something. In *People v. Allen*, 377 Ill. App. 3d 938, (2007), the court held as follows:

> "Moreover, even if the gun could have been tested for the presence of DNA and even if such testing revealed that defendant's DNA was not present, such evidence would not exonerate him. The absence of defendant's DNA on the gun would not conclusively establish that he did not handle the gun or that he did not commit the Trak Auto robbery."

The trial court could reasonably draw a similar conclusion here. Furthermore, as the trial court aptly observed, the jury's verdict in this case was rendered in spite of a lack of DNA evidence. That is, the jury's verdict did not depend on DNA linking defendant to the crime. It is difficult to discern how more evidence showing no such link would undermine the basis upon which the jury convicted defendant (primarily Conner's identification). It is not, therefore, unreasonable to conclude that additional similar evidence would not lead to a different outcome.

¶ 18 Defendant cites *People v. Davis*, 2012 IL App (4th) 110305, where it was determined that new DNA evidence was sufficiently conclusive to warrant a new trial. There, the evidence established that the defendant was not the source of serological samples (semen and blood) recovered from the victim (a raped and murdered child). *Id*. ¶ 28. Testing also indicated that the source of the DNA was another resident of the house where the crime occurred. *Id*. Being excluded from a semen sample in a sexual assault case is much more probative and compelling than being excluded from a DNA sample found on an object. As noted, there was evidence

presented in this case that a person does not always leave a DNA sample when he or she handles an object. The same cannot be said of a semen sample, where one would expect to find DNA (*People v. Waters*, 328 Ill. App. 3d 117 (2002), also cited by defendant, is distinguishable on a similar basis, as it involved the defendant's exclusion from urine recovered from the victim).

¶ 19    A point raised by defendant is that the crime scene in this case was "extremely messy." The implication seems to be that since it was so messy, one would expect to find some physical evidence from defendant if he was indeed present. We note that the State's DNA expert, Kelly Lawrence, testified that one of the reasons defendant's DNA might not have been found on the two-by-four was that "[t]here could be a lot of DNA already on the two-by-four, therefore, masking or inhibiting DNA from somebody else being seen on the board." Hence, that the crime scene was "messy" does not necessarily support the inference defendant seeks to base upon it and actually could support a contrary inference.

¶ 20    In sum, we cannot say that the trial court committed manifest error when it determined that the DNA evidence in this case did not meet the conclusiveness standard set forth in cases like *Coleman*, 2013 IL 113307, ¶ 96.

¶ 21                              2. SCIENTIFIC EVIDENCE

¶ 22    Defendant presented the testimony of Dr. Geoffrey Loftus, a professor of psychology at the University of Washington, who specializes in human perception and associated aspects of memory. The trial court recognized Loftus as an expert in the fields of perception and memory. Loftus testified that an eyewitness's level of confidence in an identification does not correlate with the accuracy of the identification. Post-incident information and events can result in false but confident memories. A witness's memories can be altered by stress, the presence of multiple offenders, and the presence of and focus upon weapons. Loftus added that the longer one has to

observe an event, the more complete the initial memory of the event will be. "Cuing" occurring after an incident, such as showing a witness a picture of an offender, can create a strong memory based on the picture rather than the event. Loftus estimated that in 70% to 80% of cases involving DNA-based exonerations, the initial convictions were based on eyewitness testimony. However, he also agreed that a person is not necessarily innocent simply because an identification is not reliable.

¶ 23    In June 2000, Loftus explained, Conners was presented with single photograph of defendant (a "show up"). Loftus considered show-up procedures "intrinsically unreliable." Further, the procedure "becomes part of the post-information itself [that] can contaminate the eventual memory." Loftus noted that Conners first identified defendant in a picture taken when he was 19 years old despite the fact that her original description of the perpetrator "T" indicated that he was in his 30s or 40s. She was presented with this photograph prior to testifying before the grand jury (a police report indicates that she was again shown this photograph in September 2002). According to Loftus, this "[i]ndicated that she's willing to make a positive identification of someone who departed from her original description, presumably reflecting her belief about what the person looked like." Moreover, the fact that five months elapsed between the crime and Conners' first identification of defendant was problematic. Memories decay over time, at least in the absence of rehearsal.

¶ 24    Finally, Loftus acknowledged authoring a report stating, "I would have no logical ethical [*sic*] difficulty testifying in any sort of legal proceeding that Ms. Conners varies [*sic*] identifications are entirely unreliable and, therefore, based upon science and logic should not be used as evidence for Mr. Williford's guilt or innocence." He then added that Conners' identifications were "among the most unreliable of any that [he had] seen in [his] 30 or so years

of consulting in this business." He clarified that he did not believe such witnesses are lying; rather, they are accurately describing their false memories.

¶ 25    The trial court found Loftus's testimony to be of limited value. It noted that while this was a high-stress event and there were three offenders, "T" was the first individual Conners encountered. "T" took Conners out of her bedroom and directed her to the kitchen, and he stood with Conners while Foxworth was being beaten. It was "T" that applied duct tape to Foxworth and splashed gasoline on him. The trial court observed that Loftus never actually interviewed Conners and "had no idea of what was going on in Conners' mind that day or in the weeks and months after the event." He never spoke with any of the police officers that administered the various identification procedures. Loftus stated that he typically does not interview actual witnesses. Further, the trial court noted that Loftus was presented with the photograph of defendant when he was 19 years old. He was then shown a line-up card (from which Conners accurately identified defendant in 2003) containing a picture of defendant at 32 years of age. Loftus did not recognize that the two photographs were of the same person. After this, he admitted that Conners may have identified defendant in the 2003 line up based on her own memory.

¶ 26    Defendant contends that this sort of evidence typically does not involve interviews of actual witnesses and represents that he is aware of no rule in any jurisdiction requiring that such interviews take place. In fact, defendant continues, allowing an expert to opine on whether any given witness was reliable would be improper. See *People v. Corral*, 2019 IL App (1st) 171501, ¶ 112-13. However, the issue here is not whether Loftus's testimony would be admissible. Rather, it is whether the trial court could attribute diminished weight to it because it was about witnesses generally as opposed to Conners' in particular. We simply cannot say that doing so is manifestly erroneous.

¶ 27 The trial court did not expressly apply the factors set forth in *Coleman* to this evidence. However, its analysis implicates the conclusiveness of the evidence. Initially, we question whether this is truly new evidence. Defendant asserts that it is because such evidence was allegedly first permitted in this state in *People v. Lerma*, 2016 IL 118496. However, we note that this evidence was allowed in *Lerma* despite the absence of pre-existing precedent. Defendant could have attempted to raise this issue. See *People v. Montano*, 2017 IL App (2d) 140326, ¶ 93 ("Accordingly, whereas [*People v. Enis*, 139 Ill. 2d 264 (1990)] allowed for but expressed caution toward the developing research concerning eyewitness identifications, today we are able to recognize that such research is well settled, well supported, and in appropriate cases a perfectly proper subject for expert testimony."). No *per se* bar existed prior to *Lerma*.

¶ 28 Moreover, we cannot conclude that the trial court's findings regarding the limited value of this evidence are manifestly erroneous. A reasonable person could conclude that the fact that Loftus did not interview Conners or the officers that administered the identification procedures diminished the weight to which his testimony was entitled. *Cf. Ennis*, 139 Ill. 2d at 289-90 ("An expert's opinion concerning the unreliability of eyewitness testimony is based on statistical averages. The eyewitness in a particular case may well not fit within the spectrum of these averages. It would be inappropriate for a jury to conclude, based on expert testimony, that all eyewitness testimony is unreliable."). That is, while general testimony about the reliability of eyewitness testimony bears some relevance in this case, the trial court reasonably observed that Loftus "had no idea of what was going on in Conners' mind that day or in the weeks and months after the event." The fact that Loftus could not tell that the photographs taken of defendant when he was 19 years old and 32 years old were of the same person provides a further reasonable basis to attribute less weight to his opinions. In short, as we cannot say that no reasonable person could

agree with the trial court, we cannot find this decision to be manifestly erroneous. These findings, in turn, indicate that the evidence is not conclusive within the meaning of *Coleman's* regimen for assessing a claim of actual innocence. See *Coleman*, 2013 IL 113307, ¶¶ 96-97.

¶ 29                           3. EVIDENCE OF MOTIVE

¶ 30    Defendant next contends that new evidence concerning the motive behind the offense supports his claim of actual innocence. At trial, Scott Henderson testified that he introduced defendant to Foxworth. Foxworth wanted to borrow some money to buy the house next door to his house. Foxworth borrowed $20,000 from defendant, who Henderson referred to as Tyrell (he later added that he called defendant Tyrell or, sometimes, Julio). Foxworth was supposed to pay defendant back with interest once he sold his house.

¶ 31    In 2014, a further investigation of the crime was conducted in an attempt to identify the other two people involved in it. The police re-interviewed Conners on two occasions and informed her they were trying to identify the others involved in the crime. She told them to talk to Henderson and that he had all the answers. She added that Henderson "was the one who help [*sic*] set up the deal." Also, "She stated that [Henderson] was a coward for not telling the truth and changing his story." During the attack, Foxworth kept stating that he thought he had until February to pay the attackers. Conners spoke with Foxworth while he was in a rehabilitation center. Foxworth told her that Henderson had set up a deal where Foxworth borrowed money to buy a kilo. The kilo "ended up being no good." He was unable to sell it, so "they came after him." Foxworth told Conners that he knew "T" but not the others involved in the attack. At one point, Henderson contacted Conners and told her to "take back her statement because it was too dangerous."

¶ 32    The police also interviewed Carl Keith Wade. Wade stated that he and Foxworth used to sell heroin together. Wade bought heroin in Chicago and sold it to Foxworth, who would then sell

it in North Chicago. Henderson would come to Foxworth's house "one or two times" per month. They would sometimes speak privately, and Wade believed they were engaged in some business dealings. Wade visited Foxworth after the attack. Foxworth told him he had opened the door (which was barricaded) on the day of the attack for Henderson. Foxworth told Wade that he had borrowed $20,000 from some people in Chicago and that he had to pay back $30,000. Carl stated that he "figured out on his own that Scott Henderson probably brokered a deal between [Foxworth] and the Chicago people."

¶ 33    A former girlfriend of Foxworth told the police that Henderson had introduced Foxworth to "loan sharks." She identified some of Foxworth's drug suppliers, including one she referred to as "Ice" whose last name was Henderson. Foxworth was a known drug dealer. Foxworth told her that his attackers burned him because "he didn't have their money."

¶ 34    The trial court found that this evidence simply indicated that defendant had a different motive to commit the crime. The court noted that motive is not an element of a crime. *People v. Talbert*, 2018 IL App (1st) 160157, ¶ 37. Moreover, the salient fact was not the reason Foxworth was in debt, it was simply that he was in debt. The trial court found that this evidence was not "of such conclusive character as would probably change the result on retrial." The trial court additionally found that this evidence could be used to impeach certain witnesses (Henderson). Generally, "newly discovered evidence 'which merely impeaches a witness' will typically not be of such conclusive character as to justify postconviction relief." *People v. Barnslater*, 373 Ill. App. 3d 512, 523 (2007) (quoting *People v. Chew*, 160 Ill. App. 3d 1082, 1086 (1987)). Evidence of actual innocence is evidence that exonerates a defendant, not merely evidence that raises a reasonable doubt as to the defendant's guilt. *People v. Collier*, 387 Ill. App. 3d 630, 636 (2008).

As the trial court's decisions are supported by fact and law, we cannot find them manifestly erroneous.

¶ 35    Defendant argues that this evidence shows that he had no motive to commit the crime. Even assuming defendant is correct, we reiterate, as the trial court noted, since motive is not an element of the crime (*Talbert*, 2018 IL App (1st) 160157, ¶ 37), it was reasonable for the trial court to conclude that this would not likely lead to a different result in a new trial.  Moreover, the trial court's finding that this showed an alternate motive for the crime is not unreasonable.  Further, there was evidence that the crime was related to drugs in some way (even in the original trial, there was evidence that one of the attackers asked "where was the stuff at."—which supports an inference that they were searching for drugs and raises a question as to whether this is truly new evidence as well).  The trial court could infer that the new evidence simply confirmed that motive.

¶ 36    Defendant also argues that this new evidence shows that Henderson was personally involved in the crime.  It is unclear to us how this exculpates defendant.  Henderson's involvement would not foreclose defendant's participation, particularly in light of the fact that Conners' testimony established that there were three perpetrators.  In any event, none of the trial court's inferences are manifestly erroneous.

¶ 37                        4. CUMULATIVE ERROR

¶ 38    Defendant contends that the cumulative effect of the three errors discussed above necessitates a new trial.  He first argues that the evidence against him was weak.  There was no physical evidence linking him to the crime.  None of the fingerprints recovered were his, nor were any of the DNA profiles.  He asserts that Conners' identification of him was "highly suspect."  The initial photograph she identified depicted a person approximately 20 years younger than the man she had described.  When presented with a photographic lineup, she stated that two men looked

-16-

like "T"; however, she then correctly identified defendant. Defendant further states that Henderson's testimony about defendant's motive was false. Additionally, he acknowledges that there was "weak" evidence of flight (defendant was apprehended in South Carolina but denied knowing that he was being sought in connection with Foxworth's death) and that he attempted to get a fellow inmate in the county jail to contact and intimidate Conners (defendant denies this).

¶ 39    The trial court found that the new evidence was not likely to lead to a different result on retrial:

> "As a result, the new motive evidence, even viewed cumulatively with Defendant's new DNA evidence, fails to convince that the jury's verdict would probably be different. Suffice it to say that considering all the evidence, old and new together, this evidence is hardly of such conclusive character as to change the result on retrial."

Given the trial court's findings (which we have determined were not manifestly erroneous above) that (1) the DNA evidence does not actually exculpate defendant; (2) the allegedly new motive evidence can be reasonably construed to indicate a different motive existed rather than establish that defendant had no motive; (3) impeachment evidence is not exonerating; and (4) it was not unreasonable to consider Loftus's testimony to be of limited value, we cannot say that the trial court's finding on the cumulative effect of these errors is manifestly erroneous.

¶ 40                      B. THE IDENTIFICATION

¶ 41    Defendant also asserts two errors with respect to Conners' identification of him. First, defendant argues that Conners' identification was so unreliable as to violate due process principles. Second, he argues his attorney was ineffective for failing to seek suppression of Conners' identification.

¶ 42                  1. RELIABILITY OF THE IDENTIFICATION

¶ 43    Defendant asserts that Conners' identification was the only direct evidence linking defendant to the crime.  He now argues that her identification was "intrinsically unreliable."  The introduction of an unreliable identification can rise to the level of a due process violation.  See *People v. Miller*, 254 Ill. App. 3d 997, 1003 (1993).  In order to succeed on such an argument, a defendant must show that the identification was the product of procedures that were " 'so unnecessarily suggestive and conducive to irreparable mistaken identification that he was denied due process of law.' "  *Id.* (quoting *People v. Blumenshine*, 42 Ill. 2d 508, 511 (1969)).  Generally, the reliability of an identification is assessed considering the totality of the circumstances, which include "(1) the witness's opportunity to view the offender at the time of the offense, (2) the witness's degree of attention at the time of the offense, (3) the accuracy of any previous description of the offender by the witness, (4) the degree of certainty shown by the witness in identifying the defendant, and (5) the length of time between the offense and the identification."  *People v. Macklin*, 2019 IL App (1st) 161165, ¶ 22.  These are known as the *Biggers* factors.  *Id.*; see also *Neil v. Biggers*, 409 U.S. 188 (1972).  Our supreme court has held that "[a] positive identification by a single eyewitness who had ample opportunity to observe is sufficient to support a conviction."  *People v. Piatowski*, 225 Ill. 2d 551, 566 (2007) (citing *People v. Vriner*, 74 Ill. 2d 329, 343 (1978)).  The reliability of an identification is a proper subject for expert testimony.  *People v. Lerma*, 2016 IL 118496, ¶ 24.

¶ 44    Defendant alleges error for several reasons.  First, in 2000, a detective presented Conners with a single photograph of defendant (a police report indicates that this occurred again in 2002).  Defendant contends that this was suggestive.   Second, when Conners' viewed the 2003 photographic line up, she stated that two men looked like "T."  She ultimately correctly identified defendant; however, she did so on what defendant asserts was not a valid basis.  Namely, she stated

that the person not identified as defendant had a thicker face. Defendant contends that the photographs show the opposite (we have viewed them and, while we do not know precisely what Conners meant, we do not believe that defendant's characterization is completely accurate, particularly concerning the two men's jaw lines). Parenthetically, we note that defendant relies on certain statements we made during the second appeal in this case evaluating the propriety of a first-stage dismissal of his postconviction petition, and he presents them as if they were conclusive findings. These findings were made in that particular context and should be taken to mean nothing greater than that defendant met the standard *at that stage of the proceedings* to allow the cause to proceed.

¶ 45    The trial court understood defendant to be arguing the presentation of a single photograph in 2000 impermissibly influenced Conners' subsequent identifications of defendant. However, it found that while showing Conners a single photograph of defendant "may have been suggestive in some ways, the evidence shows it did not contaminate Conners' 2003 identification of [d]efendant from the photographic array or her subsequent in court identification." The trial court noted that the photographs used to identify defendant were "noticeably different." Moreover, when presented with the photograph of defendant as a 19-year-old, she specifically noted that he was younger and smaller in the photograph than when she saw him commit the offense. The trial court further found that the photograph of defendant used in the 2003 array was so different than the photograph of defendant as a 19-year-old that if it significantly influenced the 2003 identification, Conners would not have been able to identify defendant in the 2003 array. The trial court observed that Loftus was, in fact, unable to identify defendant in the 2003 array after viewing the photograph of defendant as a 19-year-old despite knowing that defendant was in the array.

¶ 46    The trial court further considered the *Biggers* factors and determined that they indicated that Conners' identification was sufficiently reliable so as not to offend due process. It first noted that Conners had ample opportunity to observe defendant and her attention was focused on him. The rooms were well lit, Conners had good eyesight and had not consumed any drugs or alcohol, and she was at time only one foot away from defendant. She and defendant spoke when he entered the bedroom and brought her to the kitchen. Conners' provided a detailed description of defendant's actions, indicating she was focused upon him. The trial court found that these two factors weighed "heavily" toward finding the identification reliable.

¶ 47    Regarding the accuracy of Conners' description of the offender, the trial court acknowledged that it "did not have much detail. Further, there were "some discrepancies, such as the perpetrator's age and purported lack of facial hair." It nevertheless found that this factor "provided some, though not great, weight in favor of reliability." Regarding Conners' level of certainty, the trial court found this to weigh in favor of reliability. It noted that her level of certainty remained constant and that she consistently identified defendant when asked to do so. She was able to do so even when confronted with two photographs of similar-appearing individuals. The trial court finally found that the length of time between the event and the identification weighed against reliability. It then concluded that the factors weighing in favor of reliability outweighed the one that did not.

¶ 48    We cannot find this decision to be manifestly erroneous. This is not a case where the eyewitness (Conners) only had a fleeting glimpse of the perpetrator. To the contrary, the evidence established that Conners had an ample opportunity to observe defendant in a lighted room at close range for a significant period of time. While this occurred during horrifically stressful events, the detail with which she was able to recount the events allows an inference that she was focused on

what was going on. Further, from her recounting of defendant's actions, the trial court could infer that she was paying attention to defendant. While we might quibble with the trial court's findings on the third factor (there simply was not much in the description Conners gave of "T" to elevate confidence in the identification and she did make two errors), we could not conclude that it would outweigh the first two factors, even considering it along with the fifth factor. Moreover, the trial court's findings regarding Conner's level of confidence is not manifestly erroneous. Conners' did confidently and consistently identify defendant. We recognize that Loftus testified that this factor does not correlate with reliability; however, the trial court articulated a legitimate reason for giving limited weight to his testimony ("Dr. Loftus was unable to testify how, or even whether, these factors actually impacted Conners."). Given that at least three of the five *Biggers* factors support the trial court's decision, an opposite conclusion is clearly not apparent and the trial court's decision is not manifestly erroneous.

¶ 49    Defendant argues that the fact that Conners identified defendant from the photograph of him at 19 undermines the reliability of her identification. Conners did state that the photograph was of defendant when he was younger and smaller. Defendant attempts to characterize this as equivocation, but the trial court could infer that this enhanced her reliability in that it accurately explained the difference between how defendant appeared at 19 and during the offense. Moreover, there was evidence that even if this earlier identification were problematic, the photograph was so different from the photograph used in the 2003 array as to render the likelihood that it was suggestive minimal (notably, Loftus could not identify defendant in the array after viewing the earlier photograph). Regarding the 2003 array, defendant makes much out of the fact that Conners initially stated that two of the individuals looked like the offender. However, the trial court could conclude that her ability to successfully distinguish between two similar individuals enhanced,

rather than detracted from, the reliability of her identification. See *People v. Kelley*, 304 Ill. App. 3d 628, 637-38 (1999).

¶ 50    In sum, defendant has not established that the trial court's decision is manifestly erroneous.

¶ 51                    2. INEFFECTIVE ASSISTANCE OF COUNSEL

¶ 52    Defendant next contends that he was denied the effective assistance of counsel when his attorney failed to move to suppress Conners' identification. When a defendant asserts that he did not receive effective assistance of counsel, the following familiar standards apply. See *People v. Evans*, 186 Ill. 2d 83, 93 (1999). The defendant must show both that counsel's performance fell below an objective level of reasonableness and that this deficient performance prejudiced the defendant. *People v. Hall*, 194 Ill. 2d 305, 354 (2000). In the context of a suppression motion, a defendant must show both that the motion was meritorious and that there is a reasonable probability that the trial would have come to a different conclusion had the motion been granted. *People v. Henderson*, 2013 IL 114040, ¶ 15. Both prongs must be satisfied for a defendant to succeed, and a reviewing court may base its decision on either prong of the test. *People v. Cherry*, 2016 IL 118728, ¶ 31. Here, we elect to proceed directly to the prejudice prong. See *People v. Hale*, 2013 IL 113140, ¶ 17.

¶ 53    Initially, we note that if Conners' identification could have been suppressed, there is a reasonable probability that the trial would have come to a different result, as it constituted the single most important item of evidence against defendant. *Cf. People v. Tayborn*, 2016 IL App (3d) 130594, ¶ 23 ("Without defendant's statement that he was transporting the cocaine, there is a reasonable probability that the outcome of the trial would have been different had defendant's admission been suppressed where the admission by defendant *was the State's strongest evidence* of defendant's constructive possession of the cocaine." (Emphasis added.)). However, we must

still consider whether a motion to suppress would have been meritorious. *People v. Kornegay*, 2014 IL App (1st), 122573, ¶ 36 ("Therefore, defendant's claim does not support an argument that his trial counsel was ineffective for failing to file a suppression motion because any such motion would not have been meritorious and the omission of such a motion did not prejudice defendant.").

¶ 54    The trial court first found that defense counsel's performance did not fall below an objective standard of reasonableness. It characterized defense counsel's decision to attack Conners' identification through cross-examination rather than a motion to suppress an objectively reasonable, tactical decision. As, the trial court explained, defense counsel "attacked the witness' ability to identify [d]efendant through a lengthy cross-examination. It continued, "A substantial portion of his cross-examination of Conners addressed the details of Conners' identification of [d]efendant." Of course, matters of trial strategy may not form the basis of an ineffectiveness claim. *People v. Patterson*, 217 Ill. 2d 407, 442 (2005). Additionally, it found that defendant had not satisfied the prejudice prong of the inquiry as well. It noted that it had previously concluded that Conners' identification was sufficiently reliable. In turn, it found that a motion to suppress it would have been futile.

¶ 55    As we explain above, the trial court's decision regarding the reliability of Conners' identification was not manifestly erroneous. Given that finding, the trial court's decision that a motion to suppress it would have been futile is also not manifestly erroneous. Defendant has not, therefore, established prejudice. Since "the failure to establish either [prong] precludes a finding of ineffective assistance of counsel" (*Cherry*, 2016 IL 118728, ¶ 24), this claim must fail.

¶ 56                                   IV. CONCLUSION

¶ 57    Before concluding, we note that the trial court also ruled that defendant's petition constituted an untimely collateral attack in accordance with section 2-1401 of the Code of Civil

Procedure (735 ILCS 5/2-1401 (West 2018)).  We have addressed the merits of defendant's arguments and need not address this further, except to note that actions based on forensic testing obtained pursuant to section 116-3 of the Code of Criminal Procedure of 1963 (725 Ill. 2d 5/116-3 (West 2018)) are exempt from the usual two-year limitation.  See 735 ILCS 5/2-1401(c) (West 2018).

¶ 58    Finally, we have reviewed and considered defendant's arguments on this matter and determine that they fail to show that any portion of the trial court's decision is manifestly erroneous.  Accordingly, we affirm that decision.  We also deny the State's two motions to strike portions of defendant's brief and grant defendant's motion to cite additional authority.

¶ 59    Affirmed.